1  Christopher S. Morris, Esq., SBN 163188
   Danielle R. Pena, Esq., SBN 286002
2  Chanell A. Kachi, Esq., SBN 279761
   MORRIS LAW FIRM, APC
3  401 West A Street, Suite 1820
   San Diego, CA 92101
4  Telephone:  (619) 826-8060
   Facsimile:  (619) 826-8065
5  cmorris@morrislawfirmapc.com

6  Attorneys for Plaintiffs

7

8                UNITED STATES DISTRICT COURT

9               SOUTHERN DISTRICT OF CALIFORNIA

10

11 ROCHELLE NISHIMOTO,              Case No.   '16CV1974 BEN JMA
   individually and as Successor in
12 Interest to JASON NISHIMOTO,     **COMPLAINT FOR:**

13                    Plaintiffs,   **1. 42 U.S.C. § 1983 – 14th Amendment**
                                    **2. 42 U.S.C. § 1983 – 14th Amendment**
14      v.                          **3. 42 U.S.C. § 1983 – 14th Amendment**
                                    **4. 42 U.S.C. § 1983 – 14th Amendment**
15 COUNTY OF SAN DIEGO; and         **5. Negligence**
   DOES 1-100, inclusive,           **6. Medical Malpractice**
16                                  **7. Wrongful Death**
                     Defendants.
17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**I. INTRODUCTION**.................................................................................1

3

**II. JURISDICTION** ..................................................................4

4

**III. PARTIES** .......................................................................4

5

**IV. FACTS RELEVANT TO ALL COUNTS** ......................................5

6

**FIRST CAUSE OF ACTION 42 U.S.C Section 1983 – 14th Amendment** .... 11

7

**SECOND CAUSE OF ACTION 42 U.S.C Section 1983 – 14th Amendment** 13

8

**THIRD CAUSE OF ACTION 42 U.S.C Section 1983 – 14th Amendment** ... 18

9

**FOURTH CAUSE OF ACTION 42 U.S.C Section 1983 – Due Process –**

10

**Deprivation of Familial Relationships**.................................................20

11

**FIFTH CAUSE OF ACTION Negligence** ................................................21

12

**SIXTH CAUSE OF ACTION Medical Malpractice**......................................22

13

**SEVENTH CAUSE OF ACTION Wrongful Death** .......................................23

14

**PRAYER FOR RELIEF** ...........................................................23

15

**REQUEST FOR JURY** ...........................................................24

16

17

18

19

20

21

22

23

24

25

26

27

28

i

# I.

## __INTRODUCTION__

1.     Jason Nishimoto (Herein "Jason" or "Plaintiff") was a gentle and kind soul.  At the age of eighteen (18) he was diagnosed with schizoaffective disorder.  Jason was a high-functioning paranoid schizophrenic.  He was an avid reader and short story writer.  For the majority of his life he was employed as a welder and was primarily responsible for his own medical care. J ason was well aware of his illness and the limitations that came with it.  His own self-  awareness came with a cost -- it was clear to Jason that the side effects of his medication were beginning to have a crippling effect on his psyche and his day to day activities.

2.     As a result of his medications, Jason began to suffer from serious side effects such as morbid obesity, restless leg syndrome, and symptoms resembling Parkinson's disease.  Jason would constantly feel like his legs were on fire.  He also began developing muscle spasms throughout his body.  Towards the end of his life, Jason "wanted out" as he could no longer tolerate his illness and the side effects of the medication he took to control it.  Despite these complications, Jason diligently took his medications to avoid the commanding and life altering hallucinations that accompanied his schizophrenia.

3.     During the last five months of his life, Jason was admitted to Tri-City Medical Center (herein "Tri-City") on four different occasions.  Jason was involuntarily committed three of those times.  On each of these occasions, Jason had attempted suicide prior to being taken to Tri-City.

4.     As he had done before, on the evening of September 24, 2015, Jason swallowed a full bottle of Klonopin in an attempt to take his life.  Jason's mom,

1

Rochelle Nishimoto (herein "Rochelle"), tried to take Jason to the hospital but he refused and became agitated.  Jason's brother, Adrian, called the authorities so that Jason could be taken back to Tri-City for another 5150 Hold.  While on the phone with the 911 dispatcher, Adrian informed the dispatcher that Jason had just attempted to kill himself and that he had an extensive history with mental illness and suicide attempts.

5.      When the sheriffs arrived, they spoke to Adrian who again informed them of Jason's suicide attempt.  Jason was taken from inside the house and then placed in handcuffs.  The death investigation report states, "At the time of the arrest, the decedent made suicidal statements and stated he had consumed a large amount of pills."  Jason was arrested for assault and taken to Tri-City for medical clearance.  Fifty-nine (59) minutes later, Jason was cleared from Tri-City and was transported to Vista Detention Facility (herein "VDF") by the same arresting deputies.

6.      The next morning, on August 25, 2015, Rochelle received a phone call from a VDF psychiatric nurse.  The nurse told Rochelle that Jason was incarcerated at VDF and that she was evaluating Jason at intake but that he was too disoriented to properly communicate with her.  She inquired about Jason's medical condition, informing Rochelle that she believed he was schizophrenic and needed to know what medications Jason took.  Rochelle took this time to explain her son's illness and medication needs.  The nurse told Rochelle that she was unsure if they could get Jason's medicine because they were too expensive and that she would schedule a psych appointment for August 27, 2015.  Rochelle then explicitly informed the nurse that Jason had an extensive history with suicide attempts and that he had attempted to kill himself on September 26, 2015 (the night of his arrest).  The nurse appeared to understand Rochelle's pleas and said, "Don't worry mom, we'll take good care of your son."

/ / /

2

7.     Despite VDF staff knowing Jason had an extensive history with suicide attempts and despite Jason personally admitting he attempted suicide minutes before being arrested, combined with his disoriented behavior during intake as well as Rochelle's desperate warnings of the same, Jason was inexplicably housed in an Ad-Seg cell; not a safety cell or an "enhanced observation module" as the operative suicide protocols required.  Jason was not given his medication.  He was not seen by a psychiatrist.  He was simply left to languish.  The next night, having gone without his medication for nearly three days, Jason hung himself in his cell with a bedsheet that was attached to the air vent.

8.     It is these individuals' deliberate indifference to Jason's serious medical needs that led to his death.  Further, the County's failure to implement adequate protocols and training was also a substantial factor leading to Jason's death; these failures form the basis for the Fourteenth Amendment and wrongful death claims alleged herein.

9.     According to the U.S. Bureau of Justice Statistics, and a local news publication, San Diego has the highest suicide rate among the state's largest jail systems.  In light of this pattern, the County instituted new policies and protocols in 2015 in an effort to reduce suicides after five (5) suicides occurred in 2013, and six (6) suicides occurred in 2014.  The new matrix was put into effect in early 2015. Seemingly, the policy, or the training thereon, remains inadequate as there were seven (7) suicides in 2015 as well – well after the implementation of the new "suicide matrix."  As of May 2016, there have been three (3) more suicides. According to Kelly Davis, a local reporter for *CityBeat*, "These numbers are significant in comparison to the other five largest jail systems in California. Since 2014, San Bernardino had three jail suicides.  Los Angeles and Santa Clara have had one each; and Orange and Sacramento counties have had none."  Since 2014, there have been at least fifteen (15) suicides in San Diego County jails.

/ / /

## II.

## JURISDICTION

10.     This is a lawsuit for monetary damages and is brought pursuant to 42 U.S.C. section 1983, *et seq.*, and the Eighth and Fourteenth Amendments to the United States Constitution, for wrongful death and violation of constitutional rights by Defendants County of San Diego, VDF, and its correctional officers. Jurisdiction is founded on 28 U.S.C. sections 1331 and 1343 and the aforementioned statutory and Constitutional provisions.  State law claims for wrongful death, negligence, and failure to summon medical care are alleged as well. Plaintiffs invoke the Court's supplemental jurisdiction pursuant to 28 U.S.C. section 1367(a) to consider the state law claims.

## III.

## PARTIES

11.     This action arises from the preventable death of Jason, who at all times mentioned herein was a resident of the County of San Diego, State of California. Plaintiff, and Jason's Successor in Interest, Rochelle Nishimoto, was Jason's mother and only heir.  At all times mentioned herein, Rochelle has been and is a resident of the County of San Diego, State of California.  (Code Civ. Proc. § 377.32 Declaration of Rochelle Nishimoto, Attached hereto as Exhibit 1.)

12.     Defendant County of San Diego ("County") is, and at all times mentioned herein was, a public entity authorized by law to establish certain departments responsible for enforcing the laws and protecting the welfare of the citizens of San Diego County.  At all times mentioned herein, Defendant County was responsible for overseeing the operation, management, and supervision of the VDF, as well as its Corrections Officers, Medical Staff and inmates.

13.     The names of the individual Sheriff's Deputies, Corrections Officers, and VDF Medical Staff who were responsible for the care and custody of Jason, and who were responsible for the adhesion to and implementation of policies and

4

procedures designed to insure that the medical needs of the VDF inmates are adequately met, are currently unknown to Plaintiffs.  As such, these individuals are sued herein as DOES 1-100.

14.    The true names and capacities whether individual, corporate, associate or otherwise, of Defendants named herein as DOES 1-100 are unknown to Plaintiffs, who therefore sue said Defendants by said fictitious names.  Plaintiffs will amend this complaint to show said Defendants true names and capacities when the same have been ascertained.  Plaintiffs are informed and believe and thereon allege that all defendants sued herein as DOES are in some manner responsible for the acts and injuries alleged herein.

15.    At all times mentioned herein Defendants and DOES 1-100 were employees and/or independent contractors of Defendant San Diego County and in doing the acts hereinafter described acted within the course and scope of their employment.  The acts of all Defendants and each of them were also done under the color and pretense of the statutes, ordinances, and regulations of the County of San Diego and the State of California.  In committing the acts and/or omissions alleged herein, all Defendants acted under color of authority and/or under color of law. Plaintiffs sue all public employees named as Defendants in their individual capacities.

16.    On December 24, 2015, Plaintiff Rochelle, on behalf of herself and as Jason's Successor in Interest, filed a claim with the County of San Diego.  The claim was denied on February 5, 2016.

**IV.**

**FACTS RELEVANT TO ALL COUNTS**

17.    Jason was a loving son.  His illness, though trying in most regards, brought him closer together with his mom, Rochelle.  Once Jason was diagnosed as a paranoid schizophrenic when he was eighteen (18), it was important to Rochelle that he learn how to live with and manage his disease.  He was an extremely high

5

functioning schizophrenic.  Jason was a welder by trade; he would refit plumbing pipes on navy ships.  Jason would go to his own doctor appointments, paid his own bills, and was responsible for cooking and cleaning for himself.  In his 44 years, Jason never had a run-in with law enforcement.

18.     Approximately five (5) months prior to his death, Jason became overwhelmed by the severe side effects caused by his medication.  He began having trouble with muscle control suffering from uncontrollable tremors and ticks.  He also suffered from extreme obesity and restless leg syndrome; Jason would feel as if his legs were constantly on fire.  Though these side effects proved to be significant, Jason continued taking his medications in an effort to control is paranoid delusions and active hallucinations that accompanied his schizophrenia.

19.     On May 27, 2015, Jason started to feel as if he was losing control as the side effects began taking over.  After a conversation she had with Jason, Rochelle took Jason to Tri-City[1] where he was admitted on a 5150 Hold so that he could be put in a safe place while he was struggling with his suicidal ideations.  Jason told the staff that he wanted to "be shot by a trigger happy police officer."  Jason's May 27, 2015, medical records state, Jason was "admitted on a 5150 hold for danger to self and others" and that he "had a history of self-harm attempts by inflicting cuts and inhaling fumes."

20.     On July 5, 2015, Jason had another suicide attempt.  This time he took half a bottle of Klonopin and then took the other half thirty minutes later.  When Rochelle came downstairs she noticed Jason was acting strange.  She asked him what he did and he said "I just want to be unconscious, I don't want to wake up."  He told his mom he took half the pills and waited thirty minutes before taking the other half to ensure he wouldn't throw up the pills.  Rochelle and her other son Adrian, called 911.

/ / /

---

[1] Tri-City Medical Center is a San Diego County hospital.

COMPLAINT                                                                     CASE NO.

21.    Jason was placed on a gurney and taken to Tri-City.  He was put on another 5150 Hold due to his active suicidal ideations.  Tri-City medical records indicate that Jason also tried to hang himself while at Tri-City.  Jason's attempt was interfered with by psychiatric professionals.  When asked why he attempted suicide, Jason stated, "I'm isolated and lost in my mind."  The records also indicate that Tri-City knew Jason had a history of cutting his wrists and forearms.

22.    As had happened in the previous incident, when Jason would come back from a 5150 Hold, he would be calmer.  Jason viewed his time in Tri-City as a timeout; a safe place away from distractions and resources that encouraged his suicidal ideations.  However, due to the continuing increase of severe and immobilizing side effects, Jason would nose-dive into depression after a couple of weeks.

23.    On August 19, 2015, Jason again attempted to end his life by swallowing sixty (60) pills of Klonopin.  Rochelle immediately called 911.  Jason was taken to Tri-City via ambulance.  Again, Jason was admitted on a 5150 Hold and his commitment was later extended for fourteen (14) days.  Tri-City's records indicate Jason had "been admitted multiple times… he has a history of self-harm, apparently inflicting cuts, overdose, inhaling fumes, trying to set fires."

24.    Once Jason was released from Tri-City he had a talk with Rochelle about becoming more independent and wanting to live on his own again.  Jason was aware that his current struggles were stemming from the side effects of his medications.  But Jason continued his medication in an attempt to control his illness.  Jason was caught in a vicious circle.

25.    On September 24, 2015, Jason's desire to calm the waters surfaced again.  This attempt was no different than the others.  Jason got a call from the pharmacy that his new prescription of Klonopin was ready for pick-up.  Jason told his mom he didn't want the medication because it didn't work.  Unbeknownst to

/ / /

7

1  Rochelle, when she had left the house to run errands, Jason went to pick up his
2  pills.

3       26.     When Rochelle got home she noticed the empty bottle of Klonopin on
4  the bathroom counter.  She went looking for Jason.  Jason was mumbling and
5  stumbling around the house.  Rochelle immediately called her son Adrian, who
6  lives blocks away.  Once Adrian arrived he tried to take his brother to the hospital,
7  but Jason refused and got agitated.  Jason rushed into the house so that he could get
8  his keys to leave.  Adrian would not allow Jason to leave the house while he was
9  overdosing.  A struggle ensued.  During the struggle, Adrian called 911 with the
10  hopes that Jason would be taken to Tri-City and admitted on a 5150 Hold.  Adrian
11  kept Jason preoccupied until law enforcement arrived.

12       27.     Once the sheriffs arrived, Adrian informed them that Jason was a
13  schizophrenic and that he had just attempted to kill himself by taking an entire
14  bottle of Klonopin.  He explained that Jason had a history of mental illness and
15  suicide attempts.  The sheriffs went into the house to arrest Jason for assault,
16  despite Adrian informing them that he was not going to press charges.

17       28.     Jason's death investigation report states, "At the time of arrest, the
18  decedent (Jason) made suicidal statements and stated that he had consumed a large
19  amount of pills."

20       29.     Despite Jason's own admission and those of his brother and mother, as
21  well as Jason's extensive history with suicidal attempts and 5150 holds, Tri-City
22  cleared Jason in fifty-nine (59) minutes.  Tri-City released Jason back into the
23  sheriffs' custody, the same sheriffs that initially arrested Jason.  Jason was then
24  transported to VDF.

25       30.     During this time, Rochelle was under the impression that Jason was
26  being held on a 5150 Hold at Tri-City, as had been the case in the previous
27  instances before.  She was not aware that Jason was released from Tri-City and
28  incarcerated at VDF.

8

31.     The next morning, Rochelle received a call from a VDF psychiatric nurse.  The nurse stated that she was evaluating Jason but that he could not answer her questions because he was too disoriented.  The nurse claimed she thought Jason was schizophrenic and wanted to inquire about his medications.  Rochelle, shocked to discover Jason was not at Tri-City, took the opportunity to inform the nurse of Jason's illness and medication needs.  The nurse told Rochelle that she would expedite his psychiatric evaluation to September 27, 2015, but that she didn't think Jason's medication would be approved because it was too expensive.

32.     During that same phone call Rochelle stressed the fact that Jason had attempted suicide several times recently.  She also told the nurse that Jason tried to kill himself moments before he was arrested.  The nurse told Rochelle, "Don't worry mom, we'll take good care of your son."

33.     During Jason's incarceration he was not receiving his medications. Discovery will reveal whether this was due to the expense of the medication or due to the fact that the psychiatrist "couldn't see Jason until after the weekend."  Either way, by withholding psychotropic drugs form a drug dependent schizophrenic with active suicidal ideations VDF staff were deliberately indifferent to Jason's serious medical condition and this withholding was a substantial factor in his eventual suicide.  Despite the several warnings of ongoing suicidal ideations from both Jason and his family, and despite the nurse's evaluation that Jason was too disoriented to talk, and despite the unavailability of psychiatric medication or evaluation, Jason was inexplicably housed in an Ad-Seg cell -- not an observation or safety cell as required by the current suicide matrix.

34.     The next day Jason was found hanging from an air vent.  The noose was made from Jason's bed sheet.

35.     Had Jason been assigned a safety cell, as required, he would have been monitored every fifteen to thirty (15-30) minutes and he would have been evaluated by a mental health professional at least daily, ensuring that Jason would have

9

COMPLAINT                                                                      CASE NO.

1   received his antipsychotic medication.  Further, safety cells are free from fixtures,

2   bedding, and clothing, thereby preventing the opportunity and means for taking

3   one's own life.

4       36.    VDF was deliberately indifferent to Jason's serious medical needs

5   because VDF was informed on multiple occasions that Jason posed a high risk of

6   suicide.  In fact, it is clear from the death investigation report that VDF was

7   informed Jason attempted suicide moments before being arrested.  Further, a VDF

8   psychiatric nurse was explicitly informed by Rochelle that Jason posed a serious

9   danger to himself and that he tried to kill himself on the day of his arrest.

10      37.    Jason's family knew he was troubled.  They begged for help.  They

11  exhausted every resource available by informing all County officials that were

12  involved with Jason's arrest and incarceration.

13      38.    Based on information and belief, one of the requirements instituted in

14  the current suicide matrix relies heavily on the jails working with other partners and

15  agencies that come into contact with inmates prior to and during incarceration.

16  This is to ensure that jail staff is acutely knowledgeable about their inmates as their

17  incarceration continues.

18      39.    Thus, either the jail staff followed protocol by learning from other

19  agencies that Jason was imminently suicidal and failed to appropriately act/adhere

20  to the policy or they simply failed to acquire the information all together.

21      40.    Had there been adequate information sharing protocols, jail staff

22  would have been required to obtain information from both the on-scene sheriffs and

23  Tri-City staff.  At that point, Jason would have been flagged as a "high suicide risk"

24  pursuant to the current suicide matrix.  In this regard, the County failed to adhere to

25  its own protocol.  To magnify this point, VDF's own jail staff failed to pass-down

26  vital information regarding Jason's past and current suicidal ideations once learned

27  from Rochelle on September 25, 2015.

28  / / /

10

41.    Thus, not only was Jason inadequately processed during intake, once VDF staff was explicitly informed of Jason's current suicidal ideations, by his mother Rochelle, he remained housed in Ad-Seg rather than being placed in a safety cell.  In this regard, the County failed to adhere to its own protocols.

42.    Because of the County, and its staffs', deliberate indifference and inadequate suicide prevention matrix and mental health policies, Rochelle is now haunted by the vision of her beloved son hanging from an air vent in a cold and isolated cell all alone.  For these reasons, the County and its staff are liable for causing Jason's premature death.

## FIRST CAUSE OF ACTION

### 42 U.S.C Section 1983 – 14th Amendment

### [Against DOES 1-100 – Deliberate Indifference to a Serious Medical Need]

(Brought by Rochelle Nishimoto as Successor in Interest to

Jason Nishimoto)

43.    Plaintiff realleges and incorporates by reference all paragraphs stated above, as though fully set forth herein.

44.    Prison officials are personally liable for a plaintiff's constitutional deprivation if they acted with "deliberate indifference to a substantial risk of serious harm." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998).  To allege deliberate indifference, the medical needs must objectively be "sufficiently serious …." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  Additionally, the prison official must "know[] of and disregard[] an excessive risk to inmate health or safety . . . ." *Farmer v. Brennan*, *supra*, 511 U.S. at 837.  A prisoner's right to receive adequate medical treatment is clearly established, and it is also clearly established that prison staff cannot "intentionally deny or delay access to medical care." *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002).

/ / /

11

45.     VDF was on notice regarding Jason's current suicidal ideations by Jason's own admission, the several warnings from Adrian and Rochelle, as well as his extensive history of psychiatric holds at County institutions.  However, VDF staff failed to have Jason on suicide watch.

46.     Further, despite having been evaluated by a psychiatric nurse, who knew Jason suffered from paranoid schizophrenia and depression, Jason was not evaluated by a psychiatrist nor was he prescribed his antipsychotic medicine prior to his death.  Instead of suffering from the side effects of his medication, Jason was now suffering from active paranoid hallucinations.  Based on information and belief, the County failed to evaluate and medicate Jason because the jails are not adequately staffed or funded to perform such functions during the weekends.

47.     Alternatively, based on information and belief, Plaintiffs have learned that VDF does not have a psychiatrist on-site.  Rather, VDF only has a psychiatric nurse practitioner on site.  The practitioner is to be "supervised" by the psychiatrist; however, supervision is impossible without physical monitoring.  In reality, the psychiatrist works form another facility and simply reviews the practitioner's notes and evaluates inmates based on those notes.  It is believed that the psychiatrist rarely, if ever, evaluates the inmate in person.

48.     Still, despite these warnings and pitfalls, VDF staff took no precautions to prevent Jason from taking his own life.  He was not monitored, evaluated, or medicated.  He was not given a cellmate.  He was given bedding and housed in a cell with a light fixture from which he could hang himself; the same type of light fixture that had served as an implement of suicide many times in the past.

49.     Had VDF staff not been deliberately indifferent to Jason's medical needs by failing to provide treatment and medication or had they housed Jason in a medical unit or on suicide watch, Jason would not have had the opportunity or means to kill himself.

COMPLAINT                                                                                   CASE NO.

50.     According to the Suicide Prevention Resource Center, inmates are at the highest risk for suicide during their initial days of incarceration.  The risks increase exponentially when the inmate suffers from mental illness or prior suicide attempts.  Given Jason's imminent suicidal ideations and mental illness coupled with the triggering event of his first incarceration, it is glaringly obvious that Jason should have been monitored, evaluated, medicated, and properly housed upon intake; especially after being explicitly advised on September 25, 2015, that Jason attempted suicide moments before his arrest.

51.     In doing the acts and/or omissions herein alleged, DOE defendants were deliberately indifferent to Jason's serious medical needs which resulted in his untimely death.  The actions and inactions of the VDF staff resulted in the violation of his rights under the Fourteenth Amendment of the United States Constitution.

52.     As a result thereof, Plaintiffs are entitled to damages pursuant to 42 U.S.C. section 1983 in an amount to be proven at trial.

53.     The aforementioned acts and/or omissions of Defendants were accomplished with a conscious and indifferent disregard of Jason's rights thereby entitling Plaintiffs to an award of exemplary and punitive damages according to proof.

## SECOND CAUSE OF ACTION

### 42 U.S.C Section 1983 – 14th Amendment

### [Against Defendant County of San Diego – Suicide Matrix Policy]

(Brought by Rochelle Nishimoto as Successor in Interest to

Jason Nishimoto)

54.      Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

55.     VDF's woefully deficient "Suicide Matrix Policy" was a moving force in Jason's constitutional deprivations.  Jason was known to be actively harboring suicidal ideations and he was known to be a paranoid schizophrenic yet he wasn't

13

housed in a safety or observation cell.  These facts were admitted to by the psychiatric nurse.  Seemingly, VDF's "Suicide Matrix" fails to set forth the particular triggers and circumstances in which to initially assign a safety cell.

56.     Additionally, the severity of Jason's current suicidal ideations came squarely to the attention of VDF staff when told directly by Rochelle on September 25, 2015 -- they day before Jason hung himself -- which was one day after the suicide attempt that lead to his arrest.  In fact, during his arrest Jason himself informed the sheriffs that he had taken a large amount of pills.  As indicated in the death investigation report, Jason made other suicidal statements.

57.     First, based on the volume of information VDF had regarding Jason's imminent suicidal ideations as well as his extensive history of attempts, VDF's intake process should have properly flagged Jason as a high risk of suicide.  The County's policy failed in this regard.

58.     Further, based on information and belief, VDF's suicide matrix policy attempts to focus on the intake process, but there are no meaningful protocols that relate to the monitoring of suicidal ideations occurring after intake.  In short, VDF's suicide matrix policy does not require follow-ups for inmates who answer "yes" to the question, "have you ever attempted suicide?" unless they answer "yes" to the question, "are you currently feeling suicidal?"  Had there been protocols requiring follow up after intake, Rochelle's warnings would have been adhered to and Jason should have been assigned to a safety cell.

59.     As such, and as illustrated by the dubious distinction of having the highest suicide rate in the state, there is a custom and practice of failing to adhere to the suicide matrix in regards to the portions that do require action on the part of its staff.

60.     Additionally, based on information and belief, one of the requirements instituted in the current suicide matrix relies heavily on the jails working with other partners and agencies that come into contact with inmates prior to and during

14

incarceration.  This is to ensure that jail staff is acutely knowledgeable about their inmates as their incarceration continues.

61.     Thus, either the jail staff followed protocol by learning from other agencies that Jason was imminently suicidal and failed to appropriately act/adhere to the policy or they simply failed to acquire the information all together.

62.     Had there been adequate information sharing protocols, jail staff would have been required to obtain information from both the on-scene sheriffs and Tri-City staff.  At that point, Jason would have been flagged as a "high suicide risk" pursuant to the current suicide matrix. In this regard, the County's policy is inadequate.  To magnify this point, VDF's own jail staff failed to pass-down vital information regarding Jason's past and current suicidal ideations once learned from Rochelle on September 25, 2015.

63.     Thus, not only was Jason inadequately processed during intake, once VDF staff was explicitly informed of Jason's current suicidal ideations by his mother Rochelle, he remained housed in Ad-Seg rather than being placed in a safety cell. In this regard, the County's policy is inadequate.

64.     Another substantial factor leading to Jason's death is the County's failure to provide adequate access to mental evaluations and treatment plans. Despite having been evaluated by a psychiatric nurse who knew Jason suffered from paranoid schizophrenia and depression, Jason was not evaluated by a doctor or prescribed medicine prior to his death.  Instead of suffering from the side effects of his medication, Jason was suffering from active paranoid hallucinations.  Based on information and belief, the County failed to evaluate and medicate Jason because the jails are not adequately staffed or funded to perform such functions during the weekends.

65.     Alternatively, based on information and belief, Plaintiffs have learned that VDF does not have a psychiatrist on-site.  Rather, VDF only has a psychiatric nurse practitioner on site.  The practitioner is to be "supervised" by the psychiatrist;

15

1  however, supervision is impossible without physical monitoring.  In reality, the

2  psychiatrist works form another facility and simply reviews the practitioner's notes

3  and evaluates inmates based on those notes.  It is believed that the psychiatrist

4  rarely, if ever, evaluates the inmate in person.

5       66.    Still, despite these warnings or pitfalls, VDF staff took no precautions

6  to prevent Jason from taking his own life.  He was not monitored, evaluated, or

7  medicated.  He was not even given a cellmate.

8       67.    Had the County's policies been adequate in identifying, evaluating,

9  and treating Jason's suicidal ideations, Jason would have not had the opportunity or

10  means to kill himself.

11       68.    According to the Suicide Prevention Resource Center, inmates are at

12  the highest risk for suicide during their initial days of incarceration.  The risks

13  increase exponentially when the inmate suffers from mental illness or prior suicide

14  attempts.  Given Jason's imminent suicidal ideations and mental illness coupled

15  with the triggering event of his first incarceration, it is glaringly obvious that Jason

16  should have been monitored, evaluated, and properly housed upon intake, and

17  especially after being explicitly advised on September 25, 2015, that Jason

18  attempted suicide moments before his arrest.

19       69.    Because suicidal ideations are highly prevalent in inmates with mental

20  illnesses and suffering from prior suicidal attempts, an individualized treatment

21  plan would necessarily include a *recommended* course of medical treatment by a

22  competent physician, an increase in evaluations throughout an inmate's

23  incarceration, and a response plan tailored to triggers such as first incarcerations.

24  Such a plan would have provided Jason with more viable medical options and

25  monitoring.  Instead, he was left to suffer on his own.

26       70.    The County is well aware of its inadequate policies and treatment of

27  known suicidal inmates.  The County currently faces over eight (8) active lawsuit

28  stemming from identical allegations.  Further, the County has the dubious

16

distinction of having the highest suicide rate among the state's largest jail systems. In light of this pattern, the County instituted new policies and protocols (matrix) in 2015 in an effort to reduce suicides, after six (6) in 2014.  Seemingly, the current matrix, or the training thereon, remains inadequate as there were seven (7) suicides in 2015 and three (3) this year as of May 31, 2016.  According to Kelly Davis, a local reporter for *CityBeat*, "These numbers are significant in comparison to the other five largest jail systems in California.  Since 2014, San Bernardino had three jail suicides.  Los Angeles and Santa Clara have had one each; and Orange and Sacramento counties have had none."  Since 2014, there have been at least fifteen (15) suicides in San Diego County jails.

71.    A County is directly liable under Section 1983 where the County (1) had a policy that posed a substantial risk to plaintiffs; and (2) knew that its policy posed the risk.  *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002).  Additionally, the policy must have been the moving force behind the constitutional deprivation.  *Id*.  A policy is the "moving force" behind a deprivation of constitutional rights where the particular deficient policy is "closely related to the ultimate injury."  *Id*. at 1196.  The plaintiff need only establish "that the injury would have been avoided" had proper policies been implemented.  *Id*.

72.    Jason's death was directly caused by VDF's grossly inadequate suicide prevention policy.  Because Jason was not identified during intake, nor was he evaluated or medicated prior to his death, or properly monitored, Jason did not receive the medical attention that would have saved his life.

73.    At the very least, all that was required to save Jason's life was a policy that provided for increased observation for recognized trigger events such as the first incarcerations or safety cells for inmates with mental illnesses and/or known suicidal propensities.  As alleged, this policy, or the lack thereof, has contributed to San Diego County's jail system having the highest mortality rate of the ten (10)

/ / /

17

largest jail systems in California and the second highest suicide rate among the state's largest jail systems.

74.     The County has yet to provide Plaintiffs with exact information surrounding this event and the policies implicated by the event.  However, in accordance with Federal Rule of Civil Procedure 11(b)(3), Plaintiffs will likely obtain the evidentiary support for these allegations after a reasonable opportunity for further investigation or discovery.

75.     In doing the acts and/or omissions herein alleged, Defendants were deliberately indifferent to Jason's serious medical needs, which caused the unnecessary infliction of pain, physical injury, and death.  The actions and inactions of the defendants resulted in the violation of his rights under the Fourteenth Amendment of the United States Constitution.

76.     The aforementioned acts and/or omissions of Defendants in violating Jason's civil rights were the direct and proximate result of policies, procedures, and practices/customs of Defendants as alleged herein.

## THIRD CAUSE OF ACTION

### 42 U.S.C Section 1983 – 14th Amendment

### [Against Defendant County of San Diego – Failure to Train]

(Brought by Rochelle Nishimoto as Successor in Interest to

Jason Nishimoto)

77.     Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

78.     Pleaded in the alternative, the County of San Diego is liable for its failure to train VDF staff to recognize and treat a prisoner's serious medical needs.

79.     A County is liable for failing to adequately train jail employees where the County's omission amounts to deliberate indifference to a constitutional right. *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010).  "The standard is met when 'the need for more or different training is so obvious, and the

18

inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Id.* quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). "The need to act may be obvious because any reasonable person would recognize the need." *Gibson v. County of Washoe, Nev.*, 290 F.3d 1175, 1195 (9th Cir. 2002).

80.     The need to train jail employees to recognize and address the serious risks and triggers associated suicide prevention is obvious, especially in San Diego, where we have the highest mortality and suicide rate in California correctional facilities. Failure to identify, evaluate, and treat inmates with on-going suicidal ideations, previous attempts, and mental illness can easily result in death. The medical literature recognizes the on-going importance of identifying, evaluating, and treating suicidal inmates throughout their incarceration. As a result of the County of San Diego's failure to sufficiently train its jail employees, Jason was passed through intake, assigned a cell in Ad-Seg, in which he would receive little to no observation, and never again re-evaluated despite staff knowing Jason's on-going and current suicidal nature. Jason was never medicated or evaluated during his incarceration.

81.     Further, lack of training regarding proper pass-down techniques of vital inmate information was a substantial factor in causing Jason's death. Had VDF staff communicated with the County employees of the sheriffs' department or Tri-City, they would have learned of Jason's serious suicidal ideations as well as his advanced schizophrenia and depression. Upon those circumstances, VDF would have properly housed, evaluated, and medicated Jason.

82.     Had the County implemented an automatized system that communicates between relevant County agencies regarding inmate health, they would have learned of Jason's serious suicidal ideations as well as his advanced

/ / /

COMPLAINT                                                                      CASE NO.

1  schizophrenia and depression.  Upon those circumstances, VDF would have

2  properly housed, evaluated, and medicated Jason.

3       83.    Neither the intake screening nurse nor the VDF medical staff were

4  sufficiently trained to identify, diagnose, address, and treat suicidal inmates.  The

5  VDF staff was not trained to: (1) properly intake inmates by reviewing available

6  arrest reports and medical records, (2) re-evaluate first-time inmates with previous

7  suicide attempts during their incarceration; (3) pass-down information or

8  knowledge of an inmate's suicidal ideations to other VDF staff; (4) recognize the

9  signs and triggers of on-going suicidal ideations; or (5) obtain vital inmate

10  information for other County agencies.

11       84.    Lack of sufficient training in these areas was a direct cause of Jason's

12  death.

13       85.    Further, alternatively or in addition to, the lack of sufficient training in

14  mental health evaluations and treatments was also a direct cause of Jason's death.

15  Had VDF had meaningful pre-admissions and post-admissions mental health

16  screenings, standard examinations, intelligence tests, medication treatment plan, or

17  meaningful psychiatric evaluations Jason would have been medicated and

18  monitored, leaving him with no means to carry out his ideations.  These failures

19  demonstrates an obvious need for additional training to identify and treat inmates

20  with mental health conditions.

21  **FOURTH CAUSE OF ACTION**

22  **42 U.S.C Section 1983 – Due Process – Deprivation of Familial Relationships**

23  **[Against the County and DOES 1-100]**

24  (Brought by Rochelle Nishimoto individually)

25       86.    Plaintiffs reallege and incorporates by reference the foregoing

26  paragraphs stated above as though fully set forth herein.

27       87.    Liability for deprivation of familial relationship exists where a

28  "Defendant's conduct shocks the conscience …. What state of mind shocks the

20

conscience depends of the circumstances of a particular case." *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998).  The initial question is "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998).  The type of conduct which is most likely to rise to the "conscience-shocking level" is "conduct intended to injure in some way unjustifiable by any government interest." *Id*. at 849.  Conduct which was not intentional, but rather was *deliberately indifferent*, may nevertheless rise to the conscience-shocking level in some circumstances.  *Id. at 849-50*.

88.    Defendants' acts and/or omissions hereinabove described would shock the contemporary conscience.  As a result, Jason's mother was deprived of her constitutional right to familial association, society, and companionship, without due process of law, in violation of the Fourteenth Amendment of the United States Constitution.

## FIFTH CAUSE OF ACTION

### Negligence

### [Against DOES 1-100]

(Brought by Rochelle Nishimoto as Successor in Interest to

Jason Nishimoto)

89.    Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

90.    DOE Defendants, and each of them, have a duty to monitor, supervise, operate, and manage VDF and its inmates in a manner so as to prevent the acts and/or omissions alleged herein.  Said Defendants owed Jason, as an inmate in Defendants' custody, care, and control, a duty of due care to protect his health and physical safety.

91.    Defendants were negligent and their conduct fell below a reasonable standard of care when they failed to discharge their duties as custodians of Jason.  It

21

was foreseeable that as a result of Defendants' acts and omissions, as described above, Jason, known to have imminent suicidal tendencies and mental illnesses, would attempt to kill himself.  Notwithstanding the County's own admission that Jason attempted suicide minutes before his arrest, the County failed to act appropriately.  Instead, they housed him in an isolated cell with fixtures and bedding allowing for ease and access to kill himself.  They compounded their inaction by failing to evaluate and medicate a known suicidal schizophrenic. Defendants' breach proximately caused the injuries and damages to Jason as alleged herein.

92.     Due to their callous, oppressive and malicious conduct, Plaintiffs request punitive damages.

## SIXTH CAUSE OF ACTION
### Medical Malpractice
### [Against DOES 1-100]

(Brought by Rochelle Nishimoto as Successor in Interest to

Jason Nishimoto)

93.     Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

94.     Defendants, and each of them, have a duty to operate and manage VDF in a manner so as to prevent the acts and/or omissions alleged herein.  Said Defendants owed Jason, as an inmate in defendants' custody, care, and control, a duty of due care to protect his health and physical safety.

95.     Defendants were negligent in their administering of medical care. DOES either failed to give medical care or gave such care that falls below the standard of reasonable care when they failed to discharge their duties as custodians and/or medical professionals.  It was foreseeable that as a result of Defendants' acts and omissions, as described above, Jason, known to have suicidal tendencies and mental illnesses, would attempt to kill himself absent meaningful treatment and

22

monitoring.  Defendants' breach proximately caused injuries and damages to Jason as alleged herein.

## SEVENTH CAUSE OF ACTION

### Wrongful Death

### [Against All Defendants]

(Brought by Rochelle Nishimoto, individually, and as Successor in Interest to Jason Nishimoto)

96.     Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

97.     As a result of the VDF's negligent treatment of Jason's serious medical needs, Jason suffered a painful and untimely death.

98.     By reason of Jason's death, his heirs have suffered and continue to suffer loss of society, companionship, comfort, care, guidance, financial support, and other services as a result of Jason's preventable death.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.     For compensatory, general, and special damages against each Defendant, jointly and severally, in an amount according to proof;

2.     For punitive and exemplary damages against each individually named Defendant in their individual capacity in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct;

3.     For costs and reasonable attorney's fees pursuant to 42 U.S.C. section 1988 and as otherwise authorized by statute or law; and

4.     For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper.

/ / /

/ / /

/ / /

23

COMPLAINT                                                                                          CASE NO.

## REQUEST FOR JURY

Plaintiffs hereby request a jury trial in this action.

Respectfully submitted,

**MORRIS LAW FIRM, APC**

Dated:  May 4, 2015            *s/Christopher S. Morris*
Christopher S. Morris, Esq.
cmorris@morrislawfirmapc.com
Attorneys for Plaintiffs
ROCHELLE NISHIMOTO, Individually,
and as Successor in Interest to JASON
NISHIMOTO

24