UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROCHELLE NISHIMOTO, individually and as Successor in Interest to Jason Nishimoto,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO; Does 1-100,<br><br>Defendants. | Case No.: 3:16-cv-01974-BEN-JMA<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT** |

Before this Court is Defendant's Motion to Dismiss Plaintiff's First Amended Complaint. (Docket No. 11.) The motion is fully briefed. The Court finds the Motion suitable for determination on the papers without oral argument, pursuant to Civil Local Rule 7.1.d.1. For the reasons set for below, Defendant's motion is **DENIED**.

///
///
///
///
///
///
///

1

# BACKGROUND[1,2]

Decedent Jason Nishimoto ("Jason") was a troubled man who was diagnosed with schizoaffective disorder when he was eighteen years old. At the time of his death, Jason was forty-four years old. Despite his diagnosis, Jason independently managed his medical care and held gainful employment. Prior to the subject incident, he had no criminal history and had shown himself to be a high-functioning paranoid schizophrenic.

Approximately five months prior to his death, Jason became overwhelmed by the side effects of his medication. However, he continued to take his medication to control his paranoid delusions and the active hallucinations that accompanied his schizophrenia. On May 27, 2015, Jason had a conversation with his mother, Plaintiff and Successor in Interest Rochelle Nishimoto ("Rochelle"), which resulted in Rochelle taking Jason to Tri-City Medical Center ("Tri-City") to be placed in a 5150 Hold for his suicidal ideations. Jason's medical history showed he had a history of self-harm attempts, and Tri-City admitted him under a 5150 Hold "for danger to self and others."

On July 5, 2015, Jason attempted suicide by intentionally overdosing on one of his prescriptions. Jason then told Rochelle what he had done, and Rochelle and her other son, Adrian, called 911. Jason was taken to Tri-City and placed on another 5150 Hold for his suicidal ideations. While in Tri-City's care, Jason tried to hang himself, but psychiatric professionals intervened.

On August 19, 2015, Jason again attempted to commit suicide by overdosing on one of his medications. Rochelle immediately called 911, and Jason was taken back to Tri-City and admitted on a 5150 Hold for his suicidal ideations. This time, his commitment was extended to fourteen days.

---

[1] The factual allegations are drawn from the First Amended Complaint ("FAC"). (Docket No. 10.) The Court is not making findings of fact.
[2] Plaintiff's FAC contains largely the same allegations as her initial Complaint. Therefore, the Court repeats the overview of facts from its November 4, 2016 Order (Docket No. 9), and new allegations will be discussed where relevant to its analysis.

2

On September 25, 2015, Jason made a third suicide attempt, again overdosing on one of his medications. This time, when Rochelle and Adrian attempted to intervene, Jason was resistant, and there was a physical altercation between Jason and Adrian. Adrian called 911, and when the sheriffs arrived, Adrian informed them of Jason's schizophrenia and contemporaneous suicide attempt. Adrian also advised the sheriffs of Jason's history of mental illness and prior suicide attempts.

The sheriffs arrested Jason for assault despite Adrian's representation that he would not press charges. Jason was taken to Tri-City, who released him back to the sheriffs' custody less than an hour later. Jason was then transported to the Vista Detention Facility ("VDF").

Rochelle first learned that Jason was incarcerated at VDF the following day, when she received a phone call from a VDF psychiatric nurse. The nurse advised Rochelle that she had attempted to evaluate Jason, but was unsuccessful because he was too disoriented and could not answer her questions. The nurse stated her belief that Jason was schizophrenic and requested information about his medications.

Rochelle informed the nurse of Jason's illness and medication needs, and that he had several recent suicide attempts. Rochelle also informed the nurse that Jason had attempted suicide moments before he was arrested. The nurse told Rochelle that she would expedite his psychiatric evaluation to September 27, 2015, but did not think his medication would be approved because it was too expensive.

While Jason was held at VDF, he did not receive his medications. He was housed in an "Ad-Seg" cell, which is not an observation or safety cell. The day after Rochelle's phone call with the VDF nurse, Jason was found hanging from an air vent with a noose made from his bed sheet.

If Jason had been housed in a safety cell, he would have been monitored every 15-30 minutes, and would have been monitored by a mental health professional at least daily. Additionally, safety cells do not contain fixtures, bedding, and clothing, which serve to prevent opportunity and means for suicide attempts.

## PROCEDURAL HISTORY

On August 5, 2016, Plaintiff filed a Complaint against Defendant County of San Diego ("the County") and Does 1-100, alleging claims under 42 U.S.C. Section 1983 and a claim for wrongful death against the County. (Docket No. 1.) The County filed a motion to dismiss all claims against it and to strike certain portions of the Complaint, which the Court granted in part and granted Plaintiff leave to amend her pleading. (Docket Nos. 4, 9.) On November 22, 2016, Plaintiff filed an amended complaint, alleging the same claims for relief against the County. (Docket No. 10.) The County now moves to dismiss the federal municipal claims against it.[3] (Docket No. 11.)

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint if, taking all factual allegations as true, the complaint fails to state a plausible claim for relief on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007). Dismissal is appropriate if the complaint fails to state enough facts to raise a reasonable expectation that discovery will reveal evidence of the matter complained of, or if the complaint lacks a cognizable legal theory under which relief may be granted. *Twombly*, 550 U.S. at 556. "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

---

[3] Although the County's motion is entitled "Memorandum of Points and Authorities in Support of Motion to Dismiss First Amended Complaint," it lacks any briefing whatsoever on Plaintiff's claim against it for wrongful death. (*See* Docket No. 11.) Indeed, the County concludes its pleading with a request only for "dismissal of the municipal federal civil rights claims against the County." (*Id.* at 10.) Accordingly, the Court construes the motion as a motion for partial dismissal.

4

3:16-cv-01974-BEN-JMA

## DISCUSSSION

### A. Second and Fourth Claims for Relief

Defendant generally argues that all of Plaintiff's municipal civil rights claims against it (i.e. the Second, Third and Fourth Claims for Relief) should be dismissed. However, Defendant's motion only substantively argues for dismissal of the Third Claim for Relief. Having found the Second and Fourth Claims for Relief were sufficiently pled in the initial Complaint, and that the FAC repeats the same allegations as to these claims, the Court finds its prior Order remains sound. Therefore, the Court incorporates by reference the reasoning set forth in its November 4, 2016 Order regarding the Second and Fourth Claims for Relief. (Docket No. 9.) Accordingly, inasmuch as Defendant's motion seeks to dismiss the Second and Fourth Claims for Relief, its motion is **DENIED**.

### B. Third Claim for Relief

Plaintiff's Third Claim for Relief alleges Defendant violated Jason's[4] Fourteenth Amendment right to adequate medical care by engaging in a custom and practice of failing to adequately train its employees in identifying, evaluating, and treating suicidal inmates during their incarceration, which resulted in Jason's death. The Court previously found Plaintiff did not sufficiently plead a factual basis for this claim. Defendant argues the new allegations in the FAC remain insufficient. The Court disagrees.

To state a claim for a municipal civil rights violation, a plaintiff must allege that an "action pursuant to official municipal policy" caused her injury. *Connick v. Thompson*, 563 U.S. 51, 60-61 (2011) (quoting *Monell v. New York City Fire Dept. of Social Servs.*, 436 U.S. 654, 691 (1978)). "Official municipal policy includes the decisions of the government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to have the force of law." *Id.* at 61 (citations omitted). To satisfy Section 1983 under a failure to train theory of liability, a plaintiff must claim that

---

[4] Plaintiff asserts this claim as Jason's Successor in Interest.

the municipality adopted a policy that amounts to "deliberate indifference to the rights of the person with whom the [untrained employees] come into contact." *Id.*

"Deliberate indifference" is characterized as a "stringent standard of fault requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (quoting *Board of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). For example, a city may be deemed deliberately indifferent if its policymakers choose to retain a program which they have actual or constructive notice that one of their training programs causes city employees to violate citizens' constitutional rights. *See id.* On the other hand, a "city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent' of a decision by the city itself to violate the Constitution." *Id.* at 61-62 (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (O'Connor, J., concurring in part and dissenting in part)). When bringing a Section 1983 failure to train claim, "[a] pattern of similar constitutional violations is 'ordinarily necessary' to demonstrate deliberate indifference." *Connick, supra*, 563 U.S. at 62 (citing *Bryan Cnty., supra*, 520 U.S. at 409).

As Defendant points out and Plaintiff acknowledges, the Court previously found Plaintiff's initial Complaint lacked specific factual allegations of a pattern of similar constitutional violations that Defendant was aware of other suicides occurring under similar circumstances as Jason's suicide. In Plaintiff's FAC, there are new allegations that two years prior to Jason's September 2015 death, "there were at least six (6) suicides, associated with inmates suffering from mental health conditions, each preceded by obvious triggers and/or warning signs, either directly from the inmate or their family, that were blatantly ignored" by the County's employees at multiple San Diego County detention facilities. (FAC ¶ 108.) The FAC describes the six suicides as follows:

    1) In or around February 2013, Robert Lubsen was detained in a San Marcos campus holding cell, where he attempted to hang himself with his shoelaces. (FAC ¶ 77.) Campus police observed and intervened. (*Id.*) The following

6

day, Mr. Lubsen was transferred to VDF, where intake noted he had ligature marks around his neck. (*Id.*) VDF also "received a tip that [Mr. Lubsen] was a risk to himself," but County sheriffs "determined the tip was not credible." (*Id.*) Mr. Lubsen subsequently committed suicide. (*Id.*)

2) During a security check, County deputies discovered Jose Sierra hanging from a bed sheet. (*Id.* ¶ 102.) During the previous security check, the deputies observed an "unauthorized laundry line affixed to the top bunk in Sierra's cell, and failed to take corrective action per Sheriff's Polices [sic] & Procedures." (*Id.*) The deputies "failed to remove the unauthorized laundry line or confront Sierra to direct its removal, actions which may have prevented Sierra from carrying out the suicide at that time." (*Id.*)

3) On April 28, 2013, Anna Wade was found "hanging in her cell." (*Id.* ¶ 103.) A County deputy "violated policy and procedure by logging a security check that did not actually happen." Deputies are supposed to make hourly checks, but "two hours passed between when Wade was last seen alive and when she was found hanging in her cell." (*Id.*)

4) Hector Lleras, a schizophrenic, separately advised a Central Jail nurse and deputy that he was going to kill himself. (*Id.* ¶ 104.) "[H]e was put in a safety cell, and released 24 hours later. Almost hours after that, he was found hanging in his . . . cell." (*Id.*)

5) In 2014, Christopher Caroll, a mentally ill homeless man, was placed in Ad-Seg because he was unable to get along with other inmates. (*Id.* ¶ 105.) He "scrawled a suicide note on his cell walls in blood" and "[p]rior to hanging himself, he urinated on the floor and stuck feces and food to the ceiling of his cell." (*Id.*) He was never transferred from the Ad-Seg cell. (*Id.*)

6) Jonathan Thomas, a paranoid schizophrenic, had made multiple suicide attempts at Atascadero State Hospital. (*Id.* ¶ 106.) Additionally, in 2008, he jumped from a second tier while he was held at George Bailey. (*Id.*) The

7

Central Jail had knowledge of each of these incidents. (*Id.*) In 2014, Mr. Thomas was transferred from Atascadero to Central Jail for a routine commitment hearing, and housed him on a second tier cell. (*Id.*) "Days later Mr. Thomas jumped from the second tier sustaining severe injuries." (*Id.*)

  7) In February 2004, Kristopher NeSmith hung himself from his general population cell. He had severe mental and personality disorders, and had made previous suicide attempts while in custody. (*Id.* ¶ 106.) An hour before he was found dead in his cell, a County deputy "saw a noose hanging from NeSmith's light fixture. Instead of taking proactive measures, the deputy said, 'NeSmith, what are you trying to do? Kill yourself? Take that thing down!'" (*Id.*)

In addition, Plaintiff alleges that prior to Jason's death, the Citizens Law Enforcement Review Board ("CLERB"), an independent oversight body, "has twice found that San Diego County sheriffs' deputies violated policy and procedure in instances of inmate suicides." (*Id.* ¶ 101.) The first instance was Mr. Sierra, and the second was Ms. Wade, discussed above.

Defendant attempts to revive its prior argument that Plaintiff is required to allege a pattern of *adjudicated* constitutional violations to maintain a municipal federal rights claim. Relying on *Connick*, Defendant re-asserts that the pattern of constitutional violations must be based on "adjudicated fact," lest the Court "inevitably be engulfed by having to conduct trials within trials to ascertain whether in each instance a constitutional violation occurred[.]" (Def.'s Mot. to Dismiss, Docket No. 11-1 at 8.) The Court is not persuaded that *Connick* supports Defendant's assertion.

In *Connick*, the Supreme Court found the respondent did not establish a pattern of constitutional violations because the *Brady* violations he identified were dissimilar to the *Brady* violation he suffered. *Connick, supra,* 563 U.S. 62-63. In its discussion, the Supreme Court noted that the respondent had "every incentive at trial to establish a

8

pattern of similar violations, given that the jury instruction allowed the jury to find deliberate indifference based on, among other things, *prosecutors' 'history of mishandling' similar situations."* *Id.* at 63 n. 7 (internal citation omitted) (emphasis added). Notably, the *Connick* Court did not use the term "adjudication" and accepted the petitioner's concession that a *Brady* violation occurred against the respondent. *Id.* at 57 n. 3. Moreover, the *Connick* Court appears to have contemplated that the respondent could have established the pattern with evidence of un-adjudicated "mishandling" of "similar situations." *Id.* at 63 n. 7.

In short, the reasoning and language in *Connick* contradicts the conclusion Defendant asks this Court to draw. The Court remains unconvinced by Defendant's arguments as to this issue, and incorporates by reference its reasoning in its November 4, 2016 Order finding Plaintiff need not allege the existence of specific verdicts against Defendant for constitutional violations in order to maintain her action. (Docket No. 9.)

Finally, Defendant contends that the above incidents are not similar enough "to establish allege [sic] occurrence of a pattern of similar constitutional violations attributable to a common program deficiency, common circumstances, or common jail personnel." (Def.'s Mot. to Dismiss, Docket No. 11-1 at 5.) To support its contentions, Defendant points to the fact that the FAC does not allege that the suicides occurred at the same facility, and that the individual inmates committed suicide under dissimilar circumstances. However, Defendant's position ignores the crux of Plaintiff's FAC, which is that there is a systemic deficiency in the manner in which the County addresses inmates exhibiting suicidal ideations, and this deficiency amounts to the adoption of a policy deliberately indifferent to inmates' rights. The new allegations regarding other inmate suicides both at VDF and other County-operated facilities supports this claim.

In addition, Defendant's arguments focus heavily on Plaintiff's failure to provide proof of her allegations of similar suicides. But Plaintiff is not required to prove her allegations to survive a 12(b)(6) motion to dismiss. Rather, a plaintiff need only plead factual allegations which, taken as true, indicate a plausible claim for relief. *See* Fed. R.

9

Civ. P. 12(b)(6); *Twombly,* 550 U.S. at 556–57. The Court finds Plaintiff has met her burden. Accordingly, Defendant's Motion to Dismiss as to this claim is **DENIED**.

**CONCLUSION**

For the reasons stated above, the Court **DENIES** Defendant's Motion to Dismiss the Second, Third, and Fourth Claims for Relief in Plaintiff's First Amended Complaint.

**IT IS SO ORDERED.**

DATED: June 20, 2017

HON. ROGER T. BENITEZ
United States District Judge