UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROCHELLE NISHIMOTO, individually and as Successor in Interest to Jason Nishimoto,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>Defendants. | Case No.: 3:16-cv-01974-BEN-JMA<br><br>**ORDER DENYING DEFENDANT ANNE BRANTMAN'S MOTION TO DISMISS** |

Before the Court is Defendant Anne Brantman's motion to dismiss Plaintiff's Third Amended Complaint. (Docket No. 59.) The motion is fully briefed. For the reasons set for below, Defendant's motion is **DENIED**.

## BACKGROUND[1]

Decedent Jason Nishimoto ("Jason") was diagnosed with schizoaffective disorder when he was eighteen years old. At the time of his death, Jason was forty-four years old. Despite his diagnosis, Jason independently managed his medical care and held gainful

---

[1] The following overview of the facts are drawn from the relevant allegations of the Third Amended Complaint for the purpose of resolving the instant motion to dismiss. The Court is not making findings of fact.

employment. Prior to the subject incident, he had no criminal history and had shown himself to be a high-functioning paranoid schizophrenic.

Approximately five months prior to his death, Jason became overwhelmed by the side effects of his medication. However, he continued to take his medication to control his paranoid delusions and the active hallucinations that accompanied his schizophrenia. On May 27, 2015, Jason had a conversation with his mother, Plaintiff and Successor in Interest Rochelle Nishimoto ("Plaintiff" or "Rochelle"), which resulted in Rochelle taking Jason to Tri-City Medical Center ("Tri-City") to be placed in a 5150 Hold for his suicidal ideations. *See* Cal. Welf. & Inst. Code § 5150. Jason's medical history showed he had a history of self-harm attempts, and Tri-City admitted him under a 5150 Hold "for danger to self and others."

On July 5, 2015, Jason attempted suicide by intentionally overdosing on Klonopin, one of his prescribed medications. He ingested half of the bottle of Klonopin, and then waited thirty minutes prior to ingesting the remaining half of the bottle. Jason then told Rochelle what he had done, and Rochelle and her other son, Adrian, called 911. Jason was taken back to Tri-City and placed on another 5150 Hold for his suicidal ideations. While in Tri-City's care, Jason tried to hang himself, but psychiatric professionals intervened. Tri-City's records indicate Jason had a history of cutting his wrists and forearms.

On August 19, 2015, Jason again attempted to commit suicide by ingesting sixty pills of Klonopin. Rochelle immediately called 911, and Jason was taken back to Tri-City and admitted as a 5150 Hold for his suicidal ideations. This time, his commitment was extended to fourteen days. Tri-City's records indicate Jason had "been admitted multiple times . . . he has a history of self-harm, apparently inflicting cuts, overdose, inhaling fumes, trying to set fires."

On September 24, 2015, Jason made a third suicide attempt, once again ingesting an entire bottle of Klonopin. This time, when Rochelle and Adrian attempted to intervene, Jason was resistant, and there was a physical altercation between Jason and

Adrian. Adrian called 911, and when the sheriffs arrived, Adrian informed them of Jason's schizophrenia and contemporaneous suicide attempt. The sheriffs arrested Jason for assault despite Adrian's representation that he would not press charges. Jason was taken to Tri-City. Tri-City released him back to the sheriff's custody less than an hour later. Jason was then transported to and booked into the Vista Detention Facility ("VDF").

Rochelle first learned that Jason was incarcerated at VDF the following day, when she received a phone call from Defendant Anne Brantman ("Nurse Brantman"), a psychiatric nurse employed by Defendant Correctional Physicians Medical Group ("CPMG"). CPMG contracts with Defendant County of San Diego ("County") to provide psychiatric services inside all County jails, including VDF. During the phone call, Nurse Brantman advised Rochelle that she had attempted to evaluate Jason, but was unsuccessful because he was too disoriented and could not answer her questions. Nurse Brantman stated her belief that Jason was schizophrenic, and requested information about his medications.

Rochelle informed Nurse Brantman about Jason's illness and medication needs, and that he had made several recent suicide attempts. Rochelle also informed Nurse Brantman that Jason had attempted suicide by overdosing on his Klonopin medication moments before he was arrested. In response, Nurse Brantman told Rochelle that she would expedite Jason's psychiatric evaluation to September 27, 2015, but did not think his medication would be approved because it was too expensive.

Plaintiff alleges that Nurse Brantman's medical notes indicate she was aware of: 1) Jason's admission that he had taken "a bunch of Klonopin"; 2) Jason's recent release from Tri-City; 3) Jason's serious medical illnesses; and 4) Jason's two recent 5150 holds. Nurse Brantman's medical notes also indicated she thought Jason was "symptomatic and paranoid" and that although he denied suicidal intent, he appeared to have "a residual drugged effect."
///

According to the County's suicide prevention policies, which applies to the VDF, placement of suicidal inmates in lone cells should be avoided. Throughout Jason's detainment and subsequent death, Nurse Brantman did not prescribe Jason any medications, nor did she place or recommend that he be placed in a safety cell or an enhanced observation cell (hereinafter "EOH"). Instead, Nurse Brantman recommended Jason be placed under medical observation, which is not placement in an EOH, safety, or suicide-proof cell, and would not have addressed known suicidal ideations. If Jason had been housed in an EOH or safety cell, he would have been monitored every 15-30 minutes, and would have been evaluated by a mental health professional at least daily. Additionally, safety cells do not contain fixtures, bedding, and clothing, which serve to prevent opportunity and means for suicide attempts.

Nurse Brantman discussed her medical observation housing recommendation with unidentified people from the "VDF medical department" due to Jason's ingestion of 30-60 Klonopin pills. Ultimately, Defendant Nurse V. Felizardo made the decision to not place Jason in a medical observation cell or any other special housing, and he was placed in an Administration-Segregation ("Ad-Seg") cell. On September 27, 2015, the day after Rochelle's phone call with Nurse Brantman, Jason hung himself in his cell with a bed sheet that was attached to the air vent.

On August 5, 2016, Plaintiff initiated this action by filing her initial complaint against several defendants, excluding Nurse Brantman. (Docket No. 1.) On January 23, 2018, with the Court's leave, Plaintiff filed her Second Amended Complaint, which substituted Nurse Brantman for DOE No. 1. (Docket No. 32.) Nurse Brantman responded by filing a motion to dismiss. (Docket No. 42.)

On June 14, 2018, while the motion to dismiss was fully briefed and pending, Plaintiff filed a motion for leave to amend her pleading. (Docket No. 49.) On June 15, 2018, after Nurse Brantman's counsel represented to the Court that Nurse Brantman did not oppose Plaintiff's motion, the Court granted Plaintiff's motion and denied as moot the motion to dismiss. (Docket No. 51.) On June 18, 2018, Plaintiff filed the operative Third

4

3:16-cv-01974-BEN-JMA

Amended Complaint ("TAC"), which in relevant part advances claims against Nurse Brantman for negligence, medical malpractice, wrongful death and civil rights violations under 42 U.S.C. § 1983. Nurse Brantman now moves to dismiss some of the claims against her pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint if, taking all factual allegations as true, the complaint fails to state a plausible claim for relief on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007). Dismissal is appropriate if the complaint fails to state enough facts to raise a reasonable expectation that discovery will reveal evidence of the matter complained of, or if the complaint lacks a cognizable legal theory under which relief may be granted. *Twombly*, 550 U.S. at 556. "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

Nurse Brantman's motion only seeks dismissal of Plaintiff's First, Fourth, and Fifth Claims against her. She argues dismissal under Rule 12(b)(6) is appropriate because the TAC's factual allegations are insufficient to state any of these claims against her. The Court disagrees.

**A.    First Claim for Relief**

Plaintiff brings her First Claim for Relief under 42 U.S.C. § 1983 for violation of Jason's Fourteenth Amendment rights to adequate medical care.

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver,* 510 U.S. 266, 271 (1994) (citation omitted in original). To state a claim for violation of 42 U.S.C.

5

§ 1983, a plaintiff must allege: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution; (2) by a person acting under the color of state law. *See* 42 U.S.C. § 1983. Nurse Brantman does not dispute Plaintiff's allegations that she acted under the color of state law. Therefore, the issue is whether the TAC sufficiently alleges her alleged conduct deprived Jason of his constitutional rights.

"Inmates who sue prison officials for injuries suffered while in custody may do so under the Eighth Amendment's Cruel and Unusual Punishment Clause or, if not yet convicted, under the Fourteenth Amendment's Due Process Clause." *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1067-68 (9th Cir. 2016) (en banc) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) (holding that, under the Due Process Clause, a detainee may not be punished prior to conviction)). The parties do not dispute that Jason was a pretrial detainee at the time of the alleged conduct and his death. Thus, Jason's rights to adequate medical care derive from the Due Process Clause of the Fourteenth Amendment.

To state a Fourteenth Amendment claim for inadequate medical care, a detainee must allege that a defendant's conduct amounted to "deliberate indifference" to his or her "serious medical needs." *See Lolli v. Cnty. of Orange*, 351 F.3d 410, 419 (9th Cir. 2003) (applying "traditional Eighth Amendment standards" to Fourteenth Amendment claims for failure to provide adequate care for serious medical needs claims).

The Ninth Circuit recently held that a pretrial detainee's claim for inadequate medical care claim brought under the Fourteenth Amendment "must be evaluated under an objective deliberate indifference standard." *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018) (citing *Castro*, 833 F.3d at 1070).[2] The *Gordon* Court set forth the elements of this claim as follows:

---

[2] Nurse Brantman's motion initially argued Plaintiff was required to allege her subjective deliberate indifference to Jason's serious medical need. In opposition, Plaintiff cited *Gordon*'s contrary holding. Nurse Brantman's reply appears to abandon her earlier subjective standard argument, and to acknowledge that the objective standard

6

3:16-cv-01974-BEN-JMA

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon*, 888 F.3d at 1125.

Nurse Brantman contends Plaintiff has not sufficiently alleged the first and third elements of this claim. As to the first element, she argues that the TAC lacks factual allegations to indicate she made "an intentional decision to deny [Jason] medical care." (Reply at p. 3.) To support this argument, she cites the portions of the TAC which allege that Defendant Deputy Gertzki decided to place Jason in the "Ad-Seg" cell, and that Defendant Nurse Felizardo decided to return Jason to the "Ad-Seg" cell after rejecting her own recommendation to place Jason under medical observation. In short, she argues that because the TAC does not allege that she made the final decision regarding Jason's initial and subsequent housing placement, Plaintiff has not sufficiently pleaded this element.

The Court finds this argument unpersuasive because it ignores the crux of Plaintiff's allegations against her, *i.e.,* that she was deliberately indifferent to Jason's serious medical needs by failing to recommend his placement in an EOH or safety cell.[3] As detailed in the factual background above, the TAC alleges that the day before Jason's suicide, Nurse Brantman called and spoke with Plaintiff to request information about

---

applies. Therefore, the Court's analysis is limited to Nurse Brantman's arguments with respect to application of an objective deliberate indifference standard.

[3] The TAC also alleges Nurse Brantman recklessly disregarded Jason's serious medical needs by failing to prescribe him medication. Nurse Brantman's motion does not address this allegation. Thus, the Court concludes Nurse Brantman concedes this point.

Jason's medications because she believed he was schizophrenic.  She advised Plaintiff that she had attempted to evaluate Jason, but was unsuccessful because he was too disoriented and could not answer her questions.

During the phone call, Plaintiff informed Nurse Brantman about Jason's illness and medication needs, and that he had several recent suicide attempts.  Rochelle also informed Nurse Brantman that Jason had attempted suicide by overdosing on his Klonopin medication moments before he was arrested.  Nurse Brantman responded that she would expedite his psychiatric evaluation.  Nurse Brantman's medical notes reflect that she was aware of: 1) Jason's admission that he had taken "a bunch of Klonopin"; 2) Jason's recent release from Tri-City; 3) Jason's serious medical illnesses; and 4) Jason's two recent 5150 holds.  Nurse Brantman's medical notes also reflect she thought Jason was "symptomatic and paranoid" and that although he denied suicidal intent, he appeared to have "a residual drugged effect."

The TAC further alleges that the VDF's facilities contain different types of cells to house inmates and detainees.  An EOH or safety cell is monitored by VDF staff every 15-30 minutes, with daily evaluations by a mental health professional.  Additionally, safety cells do not contain fixtures, bedding, and clothing, which serve to prevent opportunity and means for suicide attempts.  An "Ad-Seg" cell is not an EOH or safety cell, and is not monitored or equipped to prevent suicide.  After speaking with Plaintiff, Nurse Brantman recommended Jason for medical observation, and discussed her recommendation with the VDF medical department.  A recommendation for medical observation does not mean an inmate's or detainee's placement in a safety cell, and would not have addressed known suicidal ideations.  The day after Nurse Brantman's conversation with Plaintiff, Jason committed suicide in a VDF "Ad-Seg" cell.

Based on these facts, which the Court assumes true in resolving a Rule 12(b)(6) motion, a reasonable inference may be drawn that Nurse Brantman made an *intentional decision* with respect to Jason's medical care: that he did not need the enhanced monitoring and daily mental health provider evalatuation he would have received had he

been placed in an EOH or safety cell. Nurse Brantman's decision not to recommend Jason's placement in an EOH or safety cell suggests that such placement was not discussed with the VDF medical department. As a result, a further inference may be drawn that Defendant Nurse Felizardo's ultimate decision to return Jason to the "Ad-Seg" cell was without consideration of his need to be placed in an EOH or safety cell. This is sufficient to establish the first element of Plaintiff's inadequate medical care claim.

Regarding the third element, Nurse Brantman essentially argues that her decision to recommend Jason's placement under medical observation was objectively reasonable under the circumstances.[4] But the standard for a motion to dismiss is not whether Nurse Brantman's decision was objectively reasonable, but rather whether the factual allegations of the TAC plausibly allege Nurse Brantman's decision was objectively unreasonable.

In *Gordon*, the Ninth Circuit explained that to prove the third element "the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[ ] on the facts and circumstances of each particular case.'" *Gordon*, 888 F.3d at 1125 (quoting *Castro*, 833 F.3d at 1071) (internal citations and quotation marks omitted). A state official's "mere lack of due care" does not deprive an individual of life, liberty, or property under the Fourteenth Amendment. *Id.* (internal citations omitted). Thus, in order to defeat a motion to dismiss, a plaintiff must allege facts to indicate something "more than negligence but less than subjective intent—something akin to reckless disregard." *See id.* Plaintiff's allegations are sufficient.

The TAC alleges that Nurse Brantman had to call Plaintiff because Jason was too disoriented to answer her questions, and she believed he was schizophrenic. During the call, Plaintiff personally made Nurse Brantman aware of Jason's recent suicide attempts, including the attempt to overdose on Klonopin that led to his arrest. After receiving this

---

[4] *See* Note 4, *supra.*

9

information from Plaintiff, Nurse Brantman told Plaintiff she would expedite his psychiatric evaluation. Her notes reflect an understanding that Jason ingested a large quantity of Klonopin (which corroborates Plaintiff's statements about his suicide attempt) and had previously been placed on 5150 holds. And even though her notes indicate Jason verbally denied suicidal ideations to her, her notes also indicate he was "symptomatic and paranoid" and appeared to have "a residual drugged effect."

These allegations plausibly establish that Nurse Brantman's decision not to recommend Jason's placement in an EOH or safety cell amounted to something "more than negligence but less than subjective intent—something akin to reckless disregard." *Gordon*, 888 F.3d at 1125 (internal citations and quotation marks omitted). On a complete factual record a trier of fact may ultimately conclude Nurse Brantman's decision was objectively reasonable, or perhaps such a determination could be made based on undisputed facts at the summary judgment stage. But at present, the TAC pleads facts sufficient to establish the third element of Plaintiff's inadequate medical care claim.

Finally, although not clearly articulated, Nurse Brantman's motion appears to alternatively assert that Plaintiff's Section 1983 claims against her necessarily fail because her alleged actions do not exceed mere indifference, negligence, medical malpractice, accident, or a difference of opinion in appropriate medical care. In a conclusory manner, she argues "[t]he TAC sets forth conclusory allegations which have alternate explanations. The factual allegations are grounded in medical negligence, not deliberate difference on the part of [Nurse] Brantman." (Reply at p. 8.) But this argument misses the point; although the TAC sets forth allegations which may have "alternate explanations," at this stage the Court need only determine whether the facts alleged *plausibly establish* Plaintiff's claim. For the same reasons stated above, the Court concludes Plaintiff has met her burden. Accordingly, Nurse Brantman's motion to dismiss Plaintiff's First Claim for Relief is **DENIED**.

///

10

3:16-cv-01974-BEN-JMA

## B. Fourth Claim for Relief

Plaintiff's Fourth Claim for Relief is also brought under 42 U.S.C. § 1983 for violation of her Fourteenth Amendment rights to familial association.

"It is well established that a parent has a 'fundamental liberty interest' in 'the companionship and society of his or her child' and that '[t]he state's interference with that liberty interest without due process of law is remediable under [42 U.S.C. § ]1983.'" *See Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001)) (quoting *Kelson v. City of Springfield,* 767 F.2d 651, 654–55 (9th Cir. 1985)) (additional citation omitted).

Nurse Brantman's motion does not substantively address the sufficiency of Plaintiff's allegations with respect to this claim. Instead, she appears to rely on the same arguments she advanced for dismissal of the First Claim for Relief, which the Court considered above and found unpersuasive or inappropriately raised at the motion to dismiss stage. As a result, the Court finds Nurse Brantman has not met her burden to demonstrate why dismissal of the Fourth Claim for Relief is appropriate, and her motion to dismiss this claim is **DENIED**.

## C. Fifth Claim for Relief

Plaintiff's Fifth Claim for Relief is for negligence. Nurse Brantman's motion argues this claim should be dismissed because it is duplicative of her Sixth Claim for Relief for medical malpractice. She relies on the provisions of California's Medical Injury Compensation Reform Act (MICRA), which defines "professional negligence" as:

> a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital.

*Bigler-Engler v. Breg, Inc.*, 7 Cal. App. 5th 276, 320 (Cal. Ct. App. 2017) (quoting Cal. Civ. Code § 3333.2, subds. (a), (b), (c)(2)) (additional citation omitted). In essence, Nurse Brantman contends "[g]iven that Plaintiff's negligence cause of action is only

based upon the care and treatment of [Jason], it is clearly subject to MICRA and she may only proceed on a theory of medical negligence." (Mot. at p. 18.)

But California enacted MICRA as an attempt to "reduce the cost and increase the efficiency of medical malpractice litigation by revising a number of legal rules applicable to such litigation." *Unruh-Haxton v. Regents of Univ. of California*, 162 Cal. App. 4th 343, 352 (2008) (quoting *Smith v. Ben Bennett, Inc.*, 133 Cal. App. 4th 1507, 1514 (2005)). As such, "MICRA includes statutes relating to arbitration agreements [citation], contingency fees [citation], notice before bringing suit [citation], the statute of limitations [citation], the collateral source rule [citation], the recoverability of noneconomic damages [citation], and periodic payment of any judgment [citation]." *Id.* (internal quotation marks omitted; citations omitted in original). It is not clear to the Court how MICRA precludes Plaintiff from simultaneously asserting her negligence and medical malpractice claims. Nor has Nurse Brantman offered binding or persuasive authority to support her conclusion.

Notably, California courts have long held that additional claims "may arise out of the same facts as a medical malpractice action that do not trigger MICRA." *Bigler-Engler*, 7 Cal. App. 5th at 321 (quoting *Unruh-Haxton*, 162 Cal. App. 4th at 352). In such a situation, California courts are instructed to consider whether MICRA's noneconomic damages restriction applies by determining whether the claim "nevertheless is based on the 'professional negligence' of the health care provider so as to trigger MICRA." *See Unruh-Haxton*, 162 Cal. App. 4th at 353 (quoting *Smith*, 133 Cal. App. 4th at 1514).

Moreover, this inquiry is premature at the pleadings stage, where a litigant may plead alternative theories of liability. *See* Fed. R. Civ. P. 8(d)(3). The elements of an ordinary negligence claim are: "duty, breach of duty, proximate cause, and damages." *Peredia v. HR Mobile Servs., Inc.*, 25 Cal. App. 5th 680 (Cal. Ct. App. 2018) (internal citation omitted). The elements of a medical malpractice claim are: "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession

12

commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence." *Avivi v. Centro Medico Urgente Med. Ctr.*, 159 Cal. App. 4th 463, 468 n.2 (2008) (internal citation omitted). Although the elements are similar, they are not identical. And while Plaintiff may not ultimately be able to recover under both theories (and MICRA may affect the amount of her recovery, if any), this argument is more appropriately addressed at summary judgment, after the facts have been developed. Therefore, Nurse Brantman's motion to dismiss Plaintiff's Fifth Claim for Relief is **DENIED**.

## CONCLUSION

For all of the foregoing reasons, Nurse Brantman's motion to dismiss Plaintiff's First, Fourth, and Fifth Claims for Relief is **DENIED**.

**IT IS SO ORDERED.**

Dated: September 10, 2018

Hon. Roger T. Benitez
United States District Judge