THOMAS E. MONTGOMERY, County Counsel
County of San Diego
By FERNANDO KISH, Senior Deputy (SBN 236961)
   MELISSA M. HOLMES, Senior Deputy (SBN 220961)
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-4713; Fax: (619) 531-6005
E-mail: fernando.kish@sdcounty.ca.gov

Attorneys for Defendants County of San Diego, Kyle Klein, Leah Gache, Vicky Felizardo, Lavinia Fifita, Rudolph Gertzki and Ethan Miedecke

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROCHELLE NISHIMOTO, individually and as Successor in Interest to JASON NISHIMOTO,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO; and DOES 1-100, inclusive<br><br>Defendants. | No. 16cv1974-BEN-JMA<br><br>DECLARATION OF ALFRED JOSHUA, M.D., IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT |

I, Alfred Joshua, M.D., declare:

1. I have personal knowledge of the matters set forth herein and could competently testify thereto if called upon.

2. I was the Chief Medical Officer for the San Diego Sheriff's Department and oversaw all of the medical and mental health care provided in the County detention facilities from November 2013- June 2018.

3. I earned my Bachelor of Science at Sophie Davis School of Biomedical Education, MD from Upstate University at Syracuse, and earned an MBA in Healthcare Administration from UC Irvine. I am also a board certified Emergency Medicine Physician. I have received a Certification for Certified Correctional Health Professional (CCHP) from the National Commission on Correctional Healthcare. I have also received the CCHP physician specialty certification (CCHP-P). As of November 2017, there are

1 only around 70 correctional physicians across the country who has received that designation.

4. The County maintains electronic medical records and paper records for all inmates incarcerated in County detention facilities. The medical staff and contract physicians that treat inmates in the County detention facilities make notations at the time of treatment, or shortly thereafter. Those records are maintained electronically in the normal course of business through the County's Jail Information Management System ("JIMS"). Attached as **Exhibits J, N, and O** to the Notice of Lodgment in Support of Defendants' Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment, are true and correct copies of relevant excerpts from Jason Nishimoto's JIMS records, which reflect treatment he received while incarcerated in Vista Detention Facility ("VDF").

5. Prior to Jason Nishimoto's suicide, the policies, procedures, and training at Vista Detention Facility where he was incarcerated met the applicable state standards for providing medical and mental health care when it passed Title 15 regulations, including the regulations involving the provisions of mental health treatment and treating suicidal inmates. It also met the California Department of Corrections and Rehabilitation Bi-Annual Review which is a mandated comprehensive inspection conducted by the California Standard Authority to ensure the County jails meet the minimum standards for detentions services.

6. On or about September 24, 2015, Mr. Nishimoto was medically screened by a registered nurse as part of a multi-stage screening process upon intake to VDF. During the intake medical screening, per County policy, procedure, and training the intake nurses evaluate the inmate's physical, medical, and psychological condition based on the inmate's statements and responses to a lengthy questionnaire, as well the inmate's appearance, behavior, presentation, and hospital discharge paperwork, if any.

7. Additionally, inmates in County jails have access to medical and mental health care if they request it, or if they display symptoms/behaviors warning staff that the

inmate requires care. Inmates can submit a medical request slip and they will be scheduled to be seen by the appropriate provider. Additionally, if there is a medical or mental health emergency, an inmate can request that correctional or medical staff help them get immediate medical treatment. When inmates are in their cells, there are call buttons the inmates can press to speak directly to a deputy if they have an urgent need for treatment.

8. The County nursing staff was provided with appropriate in-custody behavior training, including how to identify, treat, and elevate mental health concerns. At the time of Mr. Nishimoto's suicide, medical staff was trained to identify inmates presenting with suicidal ideations and to provide immediate, appropriate care to those inmates. The contract psychiatric Nurse Practitioner who treated Mr. Nishimoto was oriented to the County's policies and practices.

9. While suicide risks in jail facilities can be mitigated, such risks cannot be entirely eliminated. Clinical staff is only able to work with the information provided by the patient, family, and other sources to make decisions that do not deviate from the standard of care.

10. For acutely suicidal individuals, the jail has safety cells (padded rooms with no furniture, a hole in the floor with a grate for a toilet and safety garments that cannot be torn). It is not the within the standard of care or the County policies and procedures to indiscriminately place an inmate in a safety cell indefinitely or inpatient psychiatric hospitalizations. If that were the standard of care, it would create an environment where patients were afraid to access mental health services for fear of punitive measures and would create a more dangerous environment for all patients.

11. At the time of Mr. Nishimoto's suicide, the San Diego Sheriff Department detention facilities had an Enhanced Observation Protocol which was created to improve suicide prevention. This protocol allowed inmate/patients to be screened and assessed based on risk factors so they can be seen in a timely manner by a mental health professional (mental health clinician, Psychiatric Nurse Practitioner, and/or Psychiatrist).

Based on this system and the acuity guidelines created to triage psychiatric patients, Mr. Nishimoto was seen promptly and had a full assessment by Correctional Physicians Medical Group ("CPMG") Psychiatric Nurse Practitioner Anne Brantman. She made a determination that Mr. Nishimoto was not acutely suicidal. Clinical judgement is required to access suicidal risk and treatment. The policies and procedures that exist for suicide prevention do not substitute or override independent clinician judgement. This was known to every clinical provider including Nurse Practitioner Brantman. In this case, the policies and procedures were in fact followed appropriately and Mr. Nishimoto was afforded access and an independent clinician assessment for his risk of suicide in the jail. Unfortunately even with the best clinicians, a determined patient can complete suicide.

12. CPMG Nurse Practitioner Brantman was concerned about the withdrawal from benzodiazepines based on the reported ingestion and documented this in her medical note. The nursing staff took appropriate actions based on Nurse Brantman's treatment plan as documented in her medical note and scheduled a nursing sick call the same day and next day to check vital signs and reassess Mr. Nishimoto for signs of benzodiazepine withdrawal. I have seen in the medical record that shows Mr. Nishimoto was assessed for signs of benzodiazepine withdrawal by the nursing staff. Based on my review of Mr. Nishimoto's medical records, his cause of death however was suicide not benzodiazepine overdose.

13. While placement in a Medical Observation (MOB) cell would have allowed the nursing staff to do more frequent medical checks on Mr. Nishimoto, it would not prevent a suicidal attempt as the medical observation cells are not designed for suicide prevention but rather for treating medical conditions. If CPMG Nurse Practitioner Brantman wanted to have Mr. Nishimoto monitored for a medical condition while placing him in a cell for suicide precautions, she had the ability the place Mr. Nishimoto on the Enhanced Observation protocol where designated EOH Medical Isolation Cells were available to monitor both a medical condition while maintaining suicide precautions. In the event a provider places a patient into the Enhanced Observation

Protocol, the policies and procedures would dictate that the individual would have his/her clothes and bedsheet removed from them and they would be provided a safety garment and safety blanket (these safety garments/blankets are designed so they cannot be made into a noose). They would then be assessed by mental health providers at structured intervals over the next 24-48 hours to see how they were progressing. The physical jail locations they would be placed into could then be a safety cell, enhanced observation module, or enhanced observation housing medical isolation cell. These specialized areas are specifically designed to minimize the risk of serious self-harm or suicide.

14. I did not provide direct patient care nor personally provided any treatment to Mr. Nishimoto.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.

Executed this 10th day of October, 2018 in San Diego, CA.

_____ MD
ALFRED JOSHUA, M.D.