UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROCHELLE NISHIMOTO, Individually and as Successor in Interest to JASON NISHIMOTO,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>Defendants. | Case No.: 3:16-cv-1974-BEN-LL<br><br>**ORDER:**<br>**(1) GRANTING DEFENDANT BRANTMAN'S MOTION FOR SUMMARY JUDGMENT, [Doc. 86];**<br><br>**(2) DENYING MOTIONS TO SEAL [Docs. 82, 93, 107]** |

Plaintiff Rochelle Nishimoto, individually and as Successor in Interest to Jason Nishimoto, brought suit against the County of San Diego, six County employees, Correctional Physicians Medical Group ("CPMG"), and CPMG Nurse Practitioner Anne Brantman for claims related to the death of her son, Jason Nishimoto, who committed suicide while incarcerated at Vista Detention Facility.[1] NP Brantman now moves for summary judgment on the five claims against her. [Doc. 86.] CPMG joins the motion.

---

[1] The parties jointly dismissed all of Plaintiff's claims against the County of San Diego and the six individually named County Defendants. [Doc. 142.]

1

[Doc. 97.] For the following reasons, the motion is **GRANTED**, and the claims against NP Brantman and CPMG are dismissed.

## I. BACKGROUND

### A. Evidentiary Objections

NP Brantman asserts 12 evidentiary objections to which Plaintiff did not respond. [Doc. 98-1.] The Court resolves these objections before turning to the undisputed facts.

1. <u>Plaintiff's Exhibit W – Portions of Vicky Felizardo's Deposition</u>

NP Brantman claims that she advised County Nurse Vicky Felizardo that Jason Nishimoto would need a medical observation cell[2] due to his medical and suicidal needs. Plaintiff attempts to dispute such facts by citing Exhibit W to show that Nurse Felizardo "denies this conversation took place" and to show that "[she] was not even working at [Vista] on September 25, 2015." [Doc. 95 at pp. 9, 10.] NP Brantman objects that the cited testimony lacks personal knowledge under FRE 602, is irrelevant under FRE 402, and mischaracterizes the evidence.

In the cited testimony, Nurse Felizardo testifies that she lacks any memory of talking with NP Brantman on September 25, 2015, or of anything else on that day, aside from the County Operations meeting she attended.[3] Therefore, the cited testimony does not support either fact alleged by Plaintiff. First, the fact that Nurse Felizardo attended a meeting in Clairemont on September 25, 2015, does not equate to Plaintiff's unsupported assertion that Nurse Felizardo did not work at Vista *at all* that day. Second, Nurse Felizardo's inability to recall a conversation with NP Brantman does not equate to an outright denial that the conversation took place. *See Fed. Elect'n Com'n v. Toledano*, 317 F.3d 939, 949 (9th Cir. 2002) ("[F]ailure to remember and lack of knowledge are not sufficient to create

---

[2] The parties inconsistently refer to these cells as both "medical isolation" and "medical observation" cells. For consistency, all references throughout are to "medical observation" cells.

[3] Nurse Felizardo only remembered she attended the County Operations meeting that day after she reviewed a document reflecting that fact.

2

3:16-cv-1974-BEN-LL

a genuine dispute."). Furthermore, because Nurse Felizardo cannot recall that day's events, she lacks sufficient personal knowledge to testify about them. *See* FRE 602 (requiring "sufficient [evidence] to support a finding that the witness has personal knowledge of the matter"). Therefore, NP Brantman's objection to Exhibit W under both FRE 602 and as a mischaracterization of the evidence is SUSTAINED.

2. Plaintiff's Exhibit DD – Deputy Johnson's Deposition at 153:16-24

The objection is SUSTAINED. Plaintiff alleges that Deputy Johnson "adamantly testified that NP Brantman did not relay or express concern regarding Jason's suicide risk." [Doc. 95 at p. 16.] In support, Plaintiff cites Deputy Johnson's deposition at 153:16-24:

> Q:  Did Nurse Brantman ever communicate to Nurse Felizardo that Jason Nishimoto was also, in addition to suffering – potentially suffering from withdrawal symptoms, was a suicide risk?
>
> A:  No.

As NP Brantman correctly argues, however, because Deputy Johnson did not pay attention to the entirety of NP Brantman and Nurse Felizardo's conversation, he lacks personal knowledge to testify whether NP Brantman definitively did or did not discuss with Nurse Felizardo that Nishimoto was "a suicide risk." *See* [Doc. 83-8 at p. 66 (Ex. 19f, Johnson Depo., 152:10-15) ("I can't remember – I don't think she knew kind of what he did – or who he was, but, you know, NP Brantman explained what's going on with him or she believed what could possibly be going on with him, and then they had a conversation about vital signs and stuff, and *I didn't really pay attention to a whole lot of it*.") (emphasis added); *id.* at 257:25-258:2 ("I don't know what medical was made aware of by Ms. Brantman, whether they agreed that they were going to move him later or not.")].

3. Plaintiff's Exhibit EE – Michael McMunn's Expert Report

NP Brantman objects to the report of Plaintiff's expert, Michael McMunn, as lacking an authenticating declaration. Under Rule 56(c)(4), "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on

3

3:16-cv-1974-BEN-LL

the matters stated." Mr. McMunn's report fails to comply in several respects. First, the report is not signed under penalty of perjury; it merely "certifies" that the statements are true and correct. *See* Ex. EE at p. 238 ("I certify that these statements are true and correct to the best of my knowledge."). Nor is the report accompanied by any separate sworn declaration by Mr. McMunn, an alternative mechanism that courts have found to satisfy Rule 56(c)'s functional concerns. *See, e.g., Am. Federation of Musicians of United States and Canada v. Paramount Pictures Corp.*, 2017 WL 4290742 (9th Cir. Sep. 10, 2018) (finding an unsworn expert report accompanied by the expert's sworn declaration satisfied the functional concerns behind Rule 56(c)(4)).

The Court has reviewed other courts' decisions on similar facts and concludes that Mr. McMunn's unsworn expert report does not qualify for an exception, particularly because, of those courts that accepted unsworn expert reports, the reports otherwise satisfied Rule 56(c)'s requirements. For example, in *Single Chip Systems Corp. v. Intermec IP Corp.*, 2006 WL 4660129 (S.D. Cal. Nov. 6, 2006), the district court admitted unsworn expert reports where the reports stated in their introductions "that the contents were made on personal knowledge, that the facts would be admissible in evidence, and that the affiants [we]re competent to testify to the information contained herein." *Id.* at *6. Mr. McMunn's report does not so state. Rather, Mr. McMunn "declare[s] [him]self an expert to testify in this matter" and then goes on to "reserve the right to modify [his] findings, if new information or documents are later received." [Ex. EE at p. 228-29.] Plaintiff offers no response to NP Brantman's objection. Accordingly, because Mr. McMunn's expert report is not admissible evidence, the objection is SUSTAINED, and the Court will not consider the report.

4. <u>Plaintiff's Attorney Danielle Pena's Declaration at 2:19-20</u>

Finally, NP Brantman objects to a portion of Plaintiff's attorney Danielle Pena's declaration, which provides, "Mr. McMunn testified that the only acceptable housing options for Nishimoto was the EOH or a safety cell." [Doc. 95-1 at ¶ 5.] NP Brantman argues the declaration is hearsay because it is an out-of-court statement offered for its truth.

4

3:16-cv-1974-BEN-LL

The Court agrees. Had Plaintiff wished to submit Mr. McMunn's testimony, she should have submitted portions of his original deposition testimony.[4]

### B. Factual Background[5]

On September 24, 2015, Adrian Nishimoto called 911 because his brother, Jason Nishimoto, took 60 Klonopin pills and was trying to drive away in his truck. Adrian reported that, when he tried to stop Jason from leaving, Jason chased and hit him with a shovel. When the deputies arrived, Jason cooperated and was detained without incident. Deputies arrested Jason for assault with a deadly weapon and transported him to the Vista Patrol Station ("VPS") for processing.

At VPS, Deputy Klein asked Mental Health Clinician Henkel of the Psychiatric Emergency Response Team (PERT) to evaluate Jason. Per the PERT assessment, Jason did not display symptoms consistent with medical distress, he denied suicidal ideations and homicidal ideations, and he denied auditory and visual hallucinations. Jason denied any previous suicide attempts but reported an overdose one month prior. He also denied recent alcohol use and was able to appropriately respond to questions. In addition, the PERT notes reflect that Jason took Klonopin to assist him with sleeping, was not attempting to overdose, and had not been taking any of his psychiatric medications due to side effects. Based on Jason's evaluation, the team determined Jason did not satisfy the criteria necessary for involuntary commitment.

Next, deputies transported Jason to the San Diego County Sheriff's emergency room at Tri-City Medical Center ("Tri-City"). There, Dr. Colin Dougherty evaluated Jason for

---

[4] The remainder of Brantman's evidentiary objections concern various opinions from Mr. McMunn's expert report. Although many, if not all, of Brantman's remaining objections numbers 5-11 appear to have merit, the Court need not address them because the Court already determined that Mr. McMunn's report is inadmissible. Accordingly, the remaining objections are OVERRULED as moot.

[5] The following facts are undisputed for purposes of this motion. Those facts that are genuinely disputed are designated accordingly and construed in the light most favorable to Plaintiff, as the non-moving party.

medical clearance and noted Jason's history of schizoaffective disorder and use of multiple medications. Dr. Dougherty discharged Jason and instructed him to follow up with his primary psychiatrist and primary physician within one to two days.

Following discharge, deputies transported Jason to Vista Detention Facility ("Vista"). At Vista, Leah Gache, RN, performed an initial medical intake screening and noted that Jason was previously seen at Tri-City for taking a "bunch of Klonopin yesterday." Nurse Gache noted that Jason exhibited normal speech and thought process, was cooperative, denied suicidal and homicidal ideations, and did not report any hallucinations. Jason denied any history of prior suicide attempts. Nurse Gache recommended that Jason be placed on the psychiatric sick call list for the next day because of his psychiatric medications. Deputy Arjis Gertzke, the classification deputy, determined that Jason should be placed into administrative segregation because he had displayed a continual inability or unwillingness to conform to the minimum standards expected of those in mainline housing, and Deputy Gertzke suspected Jason was intellectually disabled.

On September 25, 2015, Deputy Johnson, a mental health liaison deputy, reviewed Jason's arrest report and conveyed the report's information to CPMG Defendant Anne Brantman, RN, a psychiatrist nurse practitioner. NP Brantman noted her concern about Jason's current placement in administrative segregation housing. She confirmed with charge nurse, Vicky Felizardo, RN, that there was a single medical observation cell available and discussed her recommendation to place Jason there.[6] Nurse Felizardo pushed back on NP Brantman's recommendation, saying that another inmate from Tri-City would

---

[6] Plaintiff attempts to dispute the fact that NP Brantman and Nurse Felizardo discussed Jason's housing recommendation by citing Nurse Felizardo's testimony that she does not recall the conversation with NP Brantman on September 25, 2015. As already discussed in ruling on NP Brantman's evidentiary objection, however, "failure to remember and lack of knowledge are not sufficient to create a genuine dispute." *Fed. Elect'n Com'n v. Toledano*, 317 F.3d 939, 949 (9th Cir. 2002). Therefore, this fact is not disputed.

6

3:16-cv-1974-BEN-LL

need the available medical observation cell. NP Brantman responded that Jason needed a medical observation cell because of his medical and suicidal needs, as well as Jason's likely detox and withdrawal from Klonopin.

Medical observation cells at Vista are visible from the nursing station. Nursing staff and deputies conduct hourly checks of inmates placed in medical observation cells, which can be used as enhanced observation cells. The San Diego County Sheriff's Department's Suicide Prevention and Enhanced Observation Protocol's "Decision Tree" recommends that inmates who deny active suicidal ideations but who have been identified as having suicide risk factors be placed in administrative segregation, a medical observation cell, or an observation housing unit. [Doc. 86-8 at p. 145.] The Protocol recommends placement in a safety cell only for those inmates who (1) verbalize active suicidal ideations and (2) are intoxicated and/or belligerent. [*Id.*] Inmates housed in safety cells are stripped of their clothes and belongings and given a special blanket and pair of slippers.

After talking with Nurse Felizardo, NP Brantman left to evaluate Jason in person. During NP Brantman's evaluation, Jason appeared to be under the influence, had slurred speech, flat affect, and was hard to understand but coherent enough for a conversation. Jason's chief complaint was that he had not taken his medications in a month. NP Brantman also noted Jason's long history of schizoaffective disorder with substance abuse, that Jason was still drugged from the accidental overdose, but that Jason claimed he was "okay" and denied any current suicidal ideations.

Jason gave NP Brantman permission to call his mother, Plaintiff Rochelle Nishimoto, to obtain additional medical history. Plaintiff reported that Jason had a long history of schizoaffective disorder and had been doing well until the past July when he "totally decompensated." Plaintiff also reported two prior involuntary admissions to Tri-City. She relayed that Jason had not been sleeping for weeks, often got desperate, and then would use marijuana and take too much Klonopin. Finally, she informed NP Brantman

7

that Jason took an entire bottle of Klonopin (30-60 pills) on the day before his arrest in an attempt to kill himself.[7] [Pltf's Ex. X at 71:11-72:7.]

NP Brantman concluded that Jason was too sedated to start on medication and was still drugged from the overdose. In his chart, she noted his denial of suicidal ideations ("Denies si/hi"), her treatment plan to refer Jason for vital checks and status checks because of his Klonopin overdose, as well as her recommendation for follow up with a psychiatrist in 2 days. [Doc. 86-8 at p. 86-89.]

After the phone call with Plaintiff, NP Brantman went back to the nurse's station to speak with Nurse Felizardo because she wanted to ensure that Jason would receive the last available medical observation cell. She confirmed the cell was still available by asking Nurse Felizardo. Again, Nurse Felizardo pushed back, and the two nurses "energetically" discussed Jason's arrest, Tri-City clearance, and present symptoms. NP Brantman advised that Jason could begin to suffer from medical complications because Klonopin has a long half-life, and Asian men metabolize the medication more slowly. She also warned that Jason might relapse back to self-harming behavior, given his various suicidal risk factors. Nurse Felizardo confirmed she would place Jason in the last available medical observation cell, stating, "Ok, Ms. Annie . . . we'll put him in." NP Brantman believed Nurse Felizardo would comply with her recommendation.[8]

---

[7] NP Brantman argues that Plaintiff told her Jason accidentally overdosed on the Klonopin in an attempt to fall asleep, not to kill himself. Because Plaintiff cites evidence in the record contradicting NP Brantman's account, however, this fact is disputed. [Pltf's Ex. X, 71:11-72:7.] As such, the fact is construed in favor of Plaintiff as the non-moving party.

[8] In her Opposition, Plaintiff lays out the facts surrounding the nurses' conversation but concludes with a general statement that "the county and Defendant Felizardo deny these conversations took place, and they deny being advised about moving Nishimoto or about concern for his risk of suicide." [Doc. 95 at p. 12.] This conclusory and unsupported denial, however, does not create a genuine dispute.

Medical staff never transferred Jason to a medical observation cell. This was the first time medical staff did not follow NP Brantman's housing recommendation. Jason remained in the administrative segregation cell for two more days without medication or psychiatric treatment. During a routine security check on September 27, 2015, Deputy Jose Navarro discovered Jason hanging in his cell.

In support of summary judgment, NP Brantman offers the declaration of Holly Viloria, a nurse practitioner dually-licensed in the State of California as a family nurse practitioner and psychiatric/mental health nurse practitioner with extensive experience working with schizoaffective disorder and incarcerated patients. [86-4 at ¶ 3.] After reviewing numerous pertinent materials related to the lawsuit, NP Viloria offered her sworn opinion about the standard of care required of a psychiatric nurse practitioner practicing in the Southern California community. She concluded that NP Brantman complied with the standard of care at all times during her care, evaluation, and treatment of Jason.

In her sworn opinion, NP Viloria specifically opined that Jason's "presentation did not warrant placement into a safety cell." [*Id.* at ¶ 8.] She found that, because Jason was not acutely suicidal, placement into a safety cell was not appropriate and could have been more traumatic because of his schizoaffective disorder. [*Id.*] NP Viloria additionally opined that NP Brantman appropriately recommended a psychiatric sick call within 48 hours of the initial mental health assessment, as required under San Diego County's policies and procedures. [*Id.* at ¶ 12.] Finally, NP Viloria opined that NP Brantman appropriately decided not to order any medications for Jason because of her concerns about Jason's level of consciousness/sedation from the possible Klonopin overdose, as well as his statements that he had not taken his medications for a month and had a history of severe side effects on psychotropic medications. [*Id.* at ¶ 13.] NP Viloria explained that, "[i]f [Jason] had been taking his medications regularly and was not too sedated and thus a risk for respiratory or central nervous system depression, it would have been appropriate to continue his medications." [*Id.*] NP Viloria further explained that "[a]bruptly restarting an antipsychotic or anticholinergic would have placed [Jason] at further risk for medical or

psychiatric destabilization" for several specific reasons: Jason's history of side effects with psychotropics; his not taking routine medications for at least a month; the fact that his full medical history was not available because of his intoxication; Jason's presentation with an altered sensorium; and the fact that withdrawal symptoms for Klonopin can often be delayed and last for several days, increasing risk of seizures. [*Id.*] Antipsychotic medications that would have been available at Vista act on dopamine receptors and also increase the risk of seizures. [*Id.*] Therefore, NP Viloria opined, "[i]t was essential that [Jason] be closely monitored to be free from any benzodiazepine withdrawal symptoms before his medications were restarted." [*Id.*]

## II.   DISCUSSION

### A. Legal Standard

"A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "The moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *City of Pomona*, 750 F.3d at 1049. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

NP Brantman moves for summary judgment on all of Plaintiff's claims against her, including her two § 1983 claims (Counts 1 and 4 for Deliberate Indifference to Serious Medical Needs and Deprivation of Familial Relationships) and her three California state law claims (Counts 5, 6, and 7 for Negligence, Medical Malpractice, and Wrongful Death). The Court addresses each claim in turn.

## B. Section 1983 Claims (Counts 1 and 4)

Plaintiff brings her two constitutional claims against NP Brantman under 42 U.S.C. § 1983. The parties agree that, for the purpose of evaluating those claims, Jason was a pretrial detainee because he had not been convicted of any crime. *See Castro v. County of Los Angeles*, 833 F.3d 1060, 1067 (9th Cir. 2016) (explaining plaintiff was "a pretrial detainee who had not been convicted of any crime"); *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1243 (9th Cir. 2010) (overruled on other grounds by *Castro*, 833 F.3d at 1070) (explaining plaintiff was a mentally ill "pretrial detainee confined at MDF in connection with battery and vandalism charges").

"Medical care claims brought by pretrial detainees . . . arise under the Fourteenth Amendment's Due Process Clause, rather than under the Eighth Amendment's Cruel and Unusual Punishment Clause." *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018). Accordingly, a pretrial detainee's medical care claim against an individual defendant requires:

> (1) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
> (2) those conditions put the plaintiff at substantial risk of suffering serious harm;
> (3) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
> (4) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1125.

As to the third element, the defendant's conduct must be objectively unreasonable, which turns on the facts and circumstances of each particular case. *Id.* Importantly, these claims require proof of "more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* Thus, contrary to a prisoner bringing claims under the Eighth Amendment, a pretrial detainee bringing claims under the Fourteenth Amendment "need not prove those subjective elements about the [defendant]'s *actual* awareness of the

level of risk." *Id.* at 1125, n. 4 (internal quotation marks omitted) (emphasis added). Further, "[a] court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* "[T]he mere lack of due care by a state official does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Id.*

In support of summary judgment, NP Brantman contends that her conduct was not so objectively unreasonable under the circumstances that it fell to the level of reckless disregard sufficient to support Plaintiff's § 1983 claim. Specifically, NP Brantman argues that she recommended Jason's placement in a medical observation cell, not the administrative segregation cell where he remained until his death, and she relayed her concerns to other medical staff about the physical and mental risks inherent in Jason's detox from the Klonopin, including his increased risk of suicidal ideations.

Plaintiff responds that NP Brantman was deliberately indifferent because there are "hotly disputed facts" about whether she did, in fact, recommend transferring Jason to a medical observation cell in response to learning about his medical history and risks. [Doc. 95 at p. 14.] As already discussed in the background and evidentiary objections sections, however, the facts are undisputed that (1) NP Brantman recommended a medical observation cell housing placement and (2) relayed her concerns to staff about Jason's medical and suicide-related needs. Accordingly, the Court need not further address this argument.

In the alternative, Plaintiff argues that, even if NP Brantman did make the housing recommendation she professes to have made, that recommendation was "deliberately indifferent because a medical observation cell is not a suicide prevention cell." [Doc. 95 at p. 15.] Because Plaintiff does not identify admissible evidence showing the County has "suicide prevention cells," the Court assumes that Plaintiff intends to refer to the County's "safety cells" and refers to them as such, throughout. *See* [Doc. 86-8 (San Diego County's Suicide Prevention & Enhanced Observation Protocol) (discussing decision tree and protocol for using safety cells for inmates with active suicidal ideations)].

12

3:16-cv-1974-BEN-LL

To evaluate the objective reasonableness of NP Brantman's conduct, the Court considers the information known to her at the time. The admissible evidence shows that Jason had a history of schizoaffective disorder, recently attempted to commit suicide by overdosing on Klonopin, had a history of several prior suicide attempts, denied that he was currently experiencing suicidal ideations, exhibited physical signs of overdose, and would likely go through Klonopin withdrawal, which could lead to suicidal ideations and other medical risks. The undisputed facts show that Jason repeatedly denied having any active suicidal ideations. Accordingly, NP Brantman's medical observation cell recommendation complied with the County of San Diego's Enhanced Observation Decision Tree and Protocol. [Ex. 17 at Doc. 86-8.] Plaintiff does not offer any admissible evidence to show otherwise.

NP Brantman also offers the unchallenged expert opinion of Holly Viloria, RN, MSN, FNP, PMHNP-BC who opined that NP Brantman complied with the standard of care at all times during her care for and treatment of Jason. NP Viloria opined that because Jason did not present as acutely suicidal, his presentation did not warrant placement in a safety cell. NP Viloria further opined that NP Brantman's medical observation cell recommendation was appropriate under the circumstances because such cells are within visual proximity of the nursing station, are used for enhanced observation, and are rounded every hour by both nursing staff and deputies.[9] Inmates placed in safety cells are stripped of all clothing and provided only slippers and a special blanket. Plaintiff does not dispute NP Viloria's opinion that, because of Jason's schizoaffective disorder, a decision to house Jason naked in a safety cell could have harmed his mental health further and been even more traumatic.

---

[9] Moreover, Plaintiff does not identify any evidence showing that NP Brantman behaved unreasonably by believing that medical staff would implement her placement recommendation. Rather, it is undisputed that Jason's placement was the first time staff did not follow NP Brantman's placement recommendation.

13

Plaintiff offers no admissible evidence showing that NP Brantman's medical observation cell recommendation was inappropriate. For example, Plaintiff further argues that NP Brantman should have recommended Jason's placement in a safety cell because medical observation cells have the same tie-off points and fixtures used by inmates to commit suicide as in administrative segregation cells.[10] But, an examination of Plaintiff's cited evidence does not support her assertion: Plaintiff cites an exhibit containing several photographs of Vista medical observation cells, but the Court is unable to discern the "tie-off" points in these cells. *See* [Doc. 94 at pp. 28-32.] Regardless, even assuming the difference between the cells is a properly supported fact, Plaintiff still does not support her observation with admissible evidence showing that NP Brantman's housing recommendation was somehow negligent, much less deliberately indifferent. For purposes of summary judgment, "mere allegation and speculation do not create a factual dispute." *Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 2007). Thus, without evidence, Plaintiff's conclusory argument about what NP Brantman "should have" done cannot "present[] a sufficient disagreement to require submission to a jury."[11] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

---

[10] To the extent Plaintiff also argues that NP Brantman's decision not to start Jason on medication at the time of her assessment was deliberately indifferent, the Court disagrees. Plaintiff does not offer admissible evidence showing NP Brantman should have started Jason on medications when he was still sedated by Klonopin. *See also* [Doc. 86-4 at ¶ 13 (expressing professional medical opinion that NP Brantman appropriately decided not to order medications because of "her concerns over [Jason's] level of consciousness/sedation . . . in addition to his statements that he had been off his medications for a month and had a history of severe side effects on psychotropic medications in the past")].

[11] In fact, Plaintiff concedes as much in her Opposition, providing, "[Nurse] Brantman's conduct would *not* rise to the level of deliberate indifference **if** she acted as testified to; meaning she 1) recommend [sic] a specialty cell and 2) relayed her concerns regarding Nishimoto's suicide risk." [Doc. 95 at p. 17. (italics added)]. As already discussed, these facts are undisputed, and thus, it appears that Plaintiff concedes her § 1983 claims against NP Brantman must fail. The Court agrees.

Plaintiff's citation to *Estate of Vela v. Monterey*, 2018 WL 4076317 (N.D. Cal. Aug. 27, 2018), is not persuasive. The inmate in *Estate of Vela* voiced *current* suicidal ideations and was relocated to a safety cell, as a result. Four hours later, a psychiatrist evaluated the inmate, and she was returned to administrative segregation where she hung herself four days later. The district court denied summary judgment against the psychiatrist because of the numerous issues of material fact as to the psychiatrist's adequacy of care. In sharp contrast to *Estate of Vela*, Plaintiff here does not identify any such genuine issues of material fact. Accordingly, summary judgment is **GRANTED** in NP Brantman's favor on Plaintiff's § 1983 serious medical needs claim.[12]

In addition to her deliberate indifference claim, Plaintiff brings a due process claim for deprivation of familial relationships under § 1983. Because Plaintiff's second § 1983 claim is premised on a finding that NP Brantman was deliberately indifferent, summary judgment is additionally **GRANTED** in favor of NP Brantman on Plaintiff's due process claim. *See* Plaintiff's Third Amended Complaint, Doc. 52 at ¶ 143 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998)) ("Conduct that was not intentional, but rather was *deliberately indifferent*, may nevertheless rise to the conscience-shocking level in some circumstances [sufficient to support a deprivation of familial relationships claim].").

### C. Negligence, Medical Malpractice, and Wrongful Death (Counts 5 – 7)

NP Brantman also moves for summary judgment on Plaintiff's three state law claims, each of which is based upon the same set of facts as Plaintiff's § 1983 claims.

---

[12] Although the parties did not brief the issue, the Court observes that Plaintiff is also unlikely to be able to show causation. Because NP Brantman's housing placement recommendation for transfer to a medical observation cell was not followed in the first place, it is unclear how the tragic outcome would have been different had NP Brantman recommended a safety cell, instead. In other words, the Court is skeptical that Plaintiff could show a reasonable jury could find NP Brantman's placement recommendation, which was not implemented, arguably *caused* Jason's tragic death.

An ordinary negligence claim requires duty, breach, causation, and damages. *Hayes v. County of San Diego*, 160 Cal. Rptr. 3d 684, 688 (Cal. 2013). Where the alleged negligent act occurred in the "rendering of professional services," however, the claim is one for "professional negligence" under California Code of Civil Procedure § 340.5. *See Yun Hee So v. Sook Ja Shin*, 151 Cal. Rptr. 3d 257, 265 (Cal. Ct. App. 2013). Because Plaintiff's negligence claim is for NP Brantman's acts during the "rendering of professional services," her claim is one for professional negligence.[13]

Like Plaintiff's professional negligence claim, Plaintiff's medical malpractice claim is premised upon NP Brantman's care and treatment of Jason. A medical malpractice claim requires "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximately causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence." *Avivi v. Centro Medico Urgente Med. Ctr.*, 71 Cal. Rptr. 3d 707, 714 n.2 (Cal. Ct. App. 2008) (internal citations omitted). "The standard of care in a medical malpractice case requires that physicians exercise in diagnosis and treatment that reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of the medical profession under

---

[13] "Courts have broadly interpreted 'in the rendering of professional services.'" *Yun Hee So v. Sook Ja Shin*, 151 Cal. Rptr. 3d at 265. To determine whether the claim is for "professional negligence," "the relevant test is not the degree of skill required, but whether the negligence occurred in the rendering of services for which a provider is licensed." *Canister v. Emergency Ambulance Svc., Inc.*, 72 Cal. Rptr. 3d 792, 804 (Cal. Ct. App. 2008). Thus, actions that are slightly related to patient care are considered professional negligence, so long as the negligent act occurred during the rendering of professional services. *See, e.g., Bellamy v. Appellate Dept.*, 57 Cal. Rtpr. 2d 894 (Cal. Ct. App. 1996) (allowing patient to fall off of hospital bed or gurney is professional negligence, not ordinary negligence); *Taylor v. U.S.*, 821 F.2d 1428, 1432 (9th Cir. 1987) (patient's separation from ventilator is professional negligence, "regardless of whether separation was caused by the ill-considered decision of a physician or the accidental bump of a janitor's broom").

similar circumstances." *Munro v. Regents of Univ. of Cal.*, 263 Cal. Rptr. 878, 882 (Cal. Ct. App. 1989). "The standard of care . . . is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony, unless the conduct required by the particular circumstances is within the common knowledge of the layman." *Id.* (citations omitted). "Expert evidence in a malpractice suit is conclusive as to the proof of the prevailing standard of skill and learning in the locality and of the propriety of particular conduct by the practitioner." *Willard v. Hagemeister*, 175 Cal. Rptr. 365, 369 (Cal. Ct. App. 1981).

Here, NP Brantman offers expert evidence through NP Viloria's declaration, which conclusively establishes that NP Brantman complied with the standard of care at all times during her treatment of Jason. The Court will not rehash NP Viloria's expert opinions here, as they were already discussed at length previously in Section II.B. *See also* [Doc. 86-4.] Plaintiff does not offer any admissible evidence to dispute NP Viloria's reasoning or conclusions.[14] Therefore, because a reasonable jury could not find that NP Brantman violated the standard of care owed to Jason, summary judgment is warranted on Plaintiff's professional negligence and medical malpractice claims.

Likewise, summary judgment is warranted on Plaintiff's wrongful death claim. A wrongful death claim requires negligence, causation, the death of another, and damages. *Boeken v. Philip Morris USA, Inc.*, 108 Cal. Rptr. 3d 806, 820 (Cal. 2010). For the same reasons that Plaintiff cannot show NP Brantman breached a duty to Jason, as required for a negligence claim, Plaintiff's wrongful death claim must also fail. Therefore, summary

---

[14] As previously discussed, the Court cannot consider Plaintiff's unsworn expert report. *See, e.g., Bucklin v. Am Zurich Ins. Co.*, 2013 WL 3147019, at *4 n.4 (C.D. June 19, 2013) ("Pilcher's declaration is not signed under penalty of perjury. Therefore, it is ineligible for consideration pursuant to Fed. R. Civ. P. 56(e))."). Notably, Plaintiff did not respond to NP Brantman's evidentiary objection.

judgment is **GRANTED** in NP Brantman's favor on Plaintiff's claims for professional negligence, medical malpractice, and wrongful death.[15]

### D. CPMG's JOINDER TO MOTION FOR SUMMARY JUDGMENT

CPMG filed a notice of joinder to NP Brantman's motion for summary judgment. [Doc. 97.] In its notice, CPMG provides, "Plaintiff's counsel confirmed that the only negligence claim against CPMG is for vicarious liability for Anne Brantman."[16] [*Id.*at p. 1-2.] Plaintiff offered no opposition. Because summary judgment is granted in favor of NP Brantman on Plaintiff's state law claims, CPMG cannot be held vicariously liable. Thus, summary judgment is likewise **GRANTED** in CPMG's favor on Plaintiff's remaining negligence claim.

### III. MOTIONS TO SEAL [Docs. 82, 93, 107]

In conjunction with the parties' briefing on NP Brantman's motion for summary judgment, the parties filed several motions to seal. [Docs. 82, 93, 107.] The Court has reviewed the motions and the approximately 500 pages of exhibits the parties propose to seal. The parties contend that each exhibit relates in some way to the investigation by the Citizen Law Enforcement Review Board ("CLERB"), an independent investigatory body.

There is a strong presumption in favor of public access to court records. *See Nixon v. Warner Comm'ns, Inc.*, 435 U.S. 589, 597-99 (1978). Thus, a party seeking to seal a judicial record bears the burden of overcoming this strong presumption by meeting the "compelling reasons" standard. *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003). That is, the party must "articulate[ ] compelling reasons supported by specific factual findings," *id.*, that outweigh the general history of access and the public policies favoring disclosure, such as the "public interest in understanding the judicial

---

[15] Because summary judgment is granted in NP Brantman's favor on all claims against her, the Court need not consider her additional argument about Plaintiff's claim for punitive damages.

[16] On October 11, 2018, Plaintiff and CPMG jointly moved to dismiss the deliberate indifference claims against it. [Doc. 78.]

process," *Hagestad v. Tragesser,* 49 F.3d 1430, 1434 (9th Cir. 1995). "The mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006). "Simply mentioning a general category of privilege, without further elaboration or any specific linkage with the documents, [also] does not satisfy the burden." *Id.* at 1184. A party's failure to meet the burden of articulating specific facts showing a "compelling reason" means that the "default posture of public access prevails." *Id.* at 1182.

Where the party states compelling reasons to seal, the court must "conscientiously balance[ ] the competing interests" of the public and the party who seeks to keep certain judicial records secret. *Foltz,* 331 F.3d at 1135. After considering these interests, if the court decides to seal certain judicial records, it must "base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture." *Hagestad,* 49 F.3d at 1434 (citing *Valley Broadcasting Co. v. U.S. Dist. Ct.,* 798 F.2d 1289, 1295 (9th Cir. 1986)).

The "compelling reasons" standard applies fully to dispositive motions like the one at issue here. *Kamakana*, 447 F.3d at 1179. As compelling reasons, the parties argue that (1) the documents were previously marked "confidential" under their protective order, and (2) filing the documents publicly would hamper the intent under which the CLERB was formed. The Court does not find those reasons sufficient to justify sealing. First, the "compelling reasons" standard is invoked, even if the dispositive motion, or its attachments, were previously filed under seal or protective order. *Foltz*, 331 F.3d at 1136 ("[T]he presumption of access is not rebutted where . . . documents subject to a protective order are filed under seal as attachments to a dispositive motion."). Second, California state privileges like the one asserted for CLERB investigation-related documents do not automatically justify sealing. *See, e.g., Doe v. City of San Diego*, 2014 WL 1921742, at *2-3 (S.D. Cal. May 14, 2014) (rejecting argument that state privileges automatically justify sealing).

19

Of course, the presumption in favor of public access can be overridden, but only for "good cause" where the parties show a particularized harm will result from disclosure, and where the related private interests outweigh the public's interests in access. The parties have not carried their burden here. Accordingly, the motions are **DENIED without prejudice**. Within 14 days, the parties shall either (1) file the lodged sealed exhibits publicly or (2) file renewed motions to seal. Should either party choose to file a renewed motion to seal, that party must demonstrate compelling and particularized reasons for sealing each document.

### III. CONCLUSION

For the previous reasons, summary judgment is **GRANTED** in favor of NP Brantman and CPMG on all remaining claims, and the action is dismissed. The parties' motions to seal are **DENIED without prejudice**.

**IT IS SO ORDERED.**

Date: March 22, 2019

_____
HON. ROGER T. BENITEZ
United States District Judge